**WYOMING OUTDOOR COUNCIL,**
et al., Appellants,

v.

**UNITED STATES FOREST SERVICE,**
et al., Appellees.

No. 97–5317.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 23, 1998.

Decided Jan. 15, 1999.

Susan D. Daggett argued the cause for appellants. With her on the briefs were Daniel F. Heilig and Robert B. Wiygul.

M. Alice Thurston, Attorney, United States Department of Justice, argued the cause for the federal appellees. With her on the brief were Lois J. Schiffer, Assistant Attorney General, Robert L. Klarquist and Wells D. Burgess, Attorneys.

Charles L. Kaiser argued the cause for appellees Marathon Oil Company and Rocky Mountain Oil and Gas Association. With him on the briefs were Kirby J. Iler, Charles A. Breer and Ezekiel J. Williams.

Before: WILLIAMS, SENTELLE and GARLAND, Circuit Judges.

Opinion for the court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Appellants Wyoming Outdoor Council and various other environmental groups (collectively "WOC") appeal from the district court judgment affirming a decision of the United States Forest Service ("Forest Service") authorizing oil and gas leasing of land in the Shoshone National Forest in northwestern Wyoming. WOC contends that the Forest Service violated both (1) its own regulations governing the leasing of land, 36 C.F.R. § 228.102(e), and (2) the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, by authorizing oil and gas leasing without first determining whether an adequate site-specific environmental review had been performed. We conclude that the Forest Service did not violate its own regulations and that WOC's NEPA claim is premature. As a result, we dismiss WOC's NEPA claim as outside our jurisdiction and affirm the district court's judgment.

## I. Background

### A. Statutory and Regulatory Framework

In 1987, Congress enacted the Federal Onshore Oil and Gas Leasing Reform Act of 1987, Pub. L. No. 100–203, subtitle B, 101 Stat. 1330, codified at 30 U.S.C. § 226(g)-(h), which governs the issuance of oil and gas leases for National Forest Service ("NFS") lands. The Act divides responsibility and authority for the issuing of such leases between the Secretary of Interior, acting through the Bureau of Land Management ("BLM"), and the Secretary of Agriculture, acting through the Forest Service. 30 U.S.C. § 226(h); 43 C.F.R. § 3101.7–2(a). The first responsibility is that of the Forest Service, and it is the exercise of that authority which we review today. The Act provides that the Forest Service shall regulate all surface-disturbing activities on NFS lands. 30 U.S.C. § 226(g). No permit to drill on NFS lands may be granted without analysis and approval by the Forest Service of a plan of operations covering proposed surface-disturbing activities within the lease area. *Id.*

In 1990, the Forest Service promulgated regulations implementing its responsibilities under the Act. The regulations set up a two-stage process for oil and gas leasing. The first stage is the "leasing analysis" stage, which involves the identification and mapping of areas that might be suitable for leasing. 36 C.F.R. § 228.102(c). The second stage is the "leasing decision for specific lands" stage, during which the Forest Service authorizes the BLM to offer specific lands for leasing. 36 C.F.R. § 228.102(e). The regulations require that authorization of leasing by the Forest Service shall be "subject to" three separate site-specific factual findings made by the Forest Service "[a]t such time as specific lands are being considered for leasing." *Id.* First, the Forest Service must "verify" that oil and gas leasing of the specific lands being considered has been "adequately addressed in a NEPA document, and is consistent with the Forest land and resource management plan." *Id.* § 228.102(e)(1). If the Forest Service determines that NEPA has not been adequately addressed or further environmental analysis is needed, "additional environment analysis shall be done before a leasing decision for specific lands will be made." *Id.* Second, the Forest Service must "ensure" that conditions of surface occupancy identified in § 228.102(c)(1) are properly included as stipulations in any resulting leases. *Id.* § 228.102(e)(2). Finally, the Forest Service must "determine" that "operations and development could be allowed somewhere on each proposed lease," except where stipulations in the leases will prohibit all surface-occupancy. *Id.* § 228.102(e)(3).

The preamble to the regulations contains language relevant to determining the order in which the steps laid out in the Forest Service regulation are to be performed. The preamble states that the decision to authorize the BLM to offer leases is made "at the conclusion of" the specific lands decision. 55 Fed.Reg. 10,423, 10,428–429 (Mar. 21, 1990). The preamble further states that when specific tracts of land have been identified, "the Forest Service will decide whether to authorize the BLM to offer the lease." *Id.* at 10,429. Finally, the preamble states that the Forest Service will decide whether to authorize the BLM to offer leases "[o]nce a conclusion is made with respect to each of the three required determinations" outlined in § 228.102(e), specifying that "[t]he only lease(s) that the Bureau of Land Management shall be authorized to offer are those for which the Forest Service has [made the three required findings]." *Id.* at 10,430.

The Forest Service has interpreted the regulations as being satisfied as long as the three required findings are made at some time before leases are actually issued. Thus, the Service has adopted a procedure whereby the combined "leasing analysis" and "specific lands" decisions are made on the basis of the environmental analysis set forth in 36 C.F.R. § 228.102(c) before the specific lease parcels are identified by the BLM. When deciding whether certain lands are appropriate for leasing, the Forest Service first undertakes a comprehensive oil and gas leasing analysis for forest lands. 36 C.F.R. § 228.102(c). It excludes from consideration lands that are unavailable for leasing under statute or current regulation. *Id.* § 228.102(c)(1)(iii). On the remaining lands, the Forest Service studies all environmental resources that may be affected by oil and gas activities. *Id.* § 228.102(c)(4). The Forest Service and the BLM project reasonably foreseeable oil and gas activities that may occur on forest lands. *Id.* § 228.102(c)(3). The Forest Service identifies leasing alternatives, *id.* § 228.102(c)(2), and analyzes the potential environmental impacts of oil and gas activities projected for each alternative on all forest resources, *id.* § 228.102(c)(4). The Forest Service then prepares maps depicting lands closed to oil and gas activities, lands open to those activities, and specific stipulations imposed for lands open to leasing. *Id.* § 228.102(c)(1). At this point, the Forest Service, without making the three required findings outlined in § 228.102(e), turns the process over to the BLM, which designates lease parcels and forwards those designations to the Forest Service. 43 C.F.R. § 3101.7–1(a). Only then does the Forest Service consider the three requirements of § 228.102(e), since the Forest Service interprets the "subject to" language of § 228.102(e) as merely directing it to make the three findings at any point before leases are actually issued.

When the BLM proposes to sell lease rights to specific parcels, the Forest Service conducts a "verification" procedure pursuant to 36 C.F.R. § 228.102(e). In that procedure, the Service determines whether the three finding requirements are met. If the Service determines that the requirements are met with respect to a specific parcel, it consents to the sale by the BLM. If NEPA has not been adequately addressed or further environmental analysis is otherwise required, the Service does not consent to the lease, but undertakes additional environmental analysis.

Once the Forest Service gives its final consent to the BLM to lease a specific parcel, the BLM itself determines whether any additional stipulations should be attached, and makes its independent decision whether to lease. 43 C.F.R. § 3101.7–2(a), (b). Third parties may protest the inclusion of a parcel in the lease sale and, if the protest is rejected, may appeal the decision to the Interior Board of Land Appeals ("IBLA"). *Id.* § 3101.7–3(a). The IBLA has held that, where the BLM is relying on the Forest Service's NEPA compliance to discharge its own NEPA responsibilities concerning the decision to offer the lease, the adequacy of that NEPA compliance will be considered on appeal to the IBLA. *Colorado Envtl. Coalition,* 125 IBLA 210, 220 (1993).

## B. *Procedural History*

On April 11, 1991, the Forest Service issued a notice of intent to prepare an environmental impact statement ("EIS") commenc-

ing the environmental review process under NEPA to determine what lands in the Shoshone National Forest could be made available for oil and gas leasing and what conditions could be attached to future leases. 56 Fed.Reg. 14,682 (Apr. 11, 1991). A working group, comprised of representatives from industry, environmental and other interest groups (including WOC), other agencies, local governments, and media, was formed to assist in examining the question. On June 12, 1992, the Forest Service released a draft EIS setting forth a number of alternatives for oil and gas leasing. In December 1992, after receiving a number of public comments in opposition to leasing forest lands, the Forest Service issued a final EIS. In December 1995, the Shoshone National Forest supervisor issued a record of decision ("ROD"), making 950,000 acres of the forest available for oil and gas leasing. In both the EIS and ROD, the Forest Service expressly stated that it was not making any of the findings required under 36 C.F.R. § 228.102(e), including a finding that NEPA compliance was adequate. The Forest Service stated that these findings would be made at a later date.

WOC challenged the Forest Service's failure to include the required findings in the EIS and ROD. WOC contended that the Forest Service's authorization of leasing without making the required findings violated both its own regulations and its obligations under NEPA. It pursued administrative review of the EIS and ROD, seeking a remand of the decisions and a stay of their implementation pending further environmental review. On October 9, 1996, a Deputy Regional Forester denied WOC's administrative appeal. WOC requested discretionary review of the Deputy Regional Forest Service decision. On November 22, 1996, the Forest Service informed WOC that it was denying that request.

On February 21, 1997, WOC and others filed suit in the United States District Court for the District of Columbia against the Forest Service and prospective lessees of the disputed lands, challenging the procedure that the Forest Service had announced it would use for the allocation of oil and gas leases in the Shoshone. The district court granted summary judgment in favor of the Forest Service and the other defendants, holding that the Forest Service's interpretation of its own regulations was entitled to "substantial deference" and was not unreasonable. *Wyoming Outdoor Council v. United States Forest Serv.*, 981 F.Supp. 17, 18 (D.D.C.1997). The court further ruled that the Forest Service's EIS was sufficiently site-specific that it did not violate NEPA requirements. *Id.* at 20. WOC filed the present appeal.

In the meantime, the Forest Service continued with its administrative handling of the leasing question. On May 3, 1997, the Service completed the required NEPA verification and validation process under 36 C.F.R. § 228.102(e). Following this verification process, in April 1998, the BLM gave notice that it would be offering a competitive oil and gas lease sale, which would include three parcels in the Shoshone National Forest. The BLM subsequently leased one of the three parcels after receiving competitive bids. A second was later leased non-competitively. On June 1, 1998, WOC filed an administrative protest of the BLM's offering of the three Shoshone leases. In its protest, WOC raised many of the same issues it has in this case, including its allegation that the Forest Service, by authorizing the BLM to issue leases prior to conducting the verification process, violated NEPA and the Forest Service's own regulations.

## II. Jurisdiction

At the suggestion of the court, the parties addressed the question of our jurisdiction. Because Article III courts are courts of limited jurisdiction, we must examine our authority to hear a case before we can determine the merits. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 118 S.Ct. 1003, 1012–13, 140 L.Ed.2d 210 (1998). At the most elemental level, the constitutional minimum for the exercise of our jurisdiction is a dispute presenting a justiciable "case or controversy." U.S. Const. art. III, § 2; *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). The courts have developed various doctrines of case-or-controversy jurispru-

dence designed to "test the fitness of controversies for judicial resolution." *Louisiana Envtl. Action Network v. Browner*, 87 F.3d 1379, 1382 (D.C.Cir.1996). One of these doctrines requires that litigants seeking to invoke our jurisdiction must have "standing." Although the Forest Service is willing to concede jurisdiction, the private appellees, at least under our prodding, raise the contention that appellants lack standing to pursue their claims. Because this is a jurisdictional question, the Forest Service's concession is of no moment, and even if no appellee objected to the lack of standing, we would be required to examine it on our own motion. *Green v. Department of Commerce*, 618 F.2d 836, 839 (D.C.Cir.1980) ("Parties may not confer jurisdiction upon the court by consent.").

■ In order to establish standing under Article III, a litigant seeking to invoke the jurisdiction of a federal court must demonstrate that (1) it has suffered an injury-in-fact (2) which is caused by, or is fairly traceable to, the defendant's alleged unlawful conduct and (3) which is likely to be redressed by a favorable decision of the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Even where these constitutional requisites for Article III standing are present, a party may still lack standing under "prudential" principles. *See Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99–100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474–75, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Navegar, Inc. v. United States*, 103 F.3d 994, 998 (D.C.Cir.1997). Litigants seeking to assert the rights of third parties, proffering grievances unrelated to the "zone of interests" intended to be protected or regulated by a particular statutory or constitutional provision, or seeking adjudication of generalized grievances more appropriately addressed in the representative branches have been found to lack standing on prudential grounds. *See Valley Forge*, 454 U.S. at 474–75, 102 S.Ct. 752; *Gladstone*, 441 U.S. at 99–100, 99 S.Ct. 1601; *Allen*, 468 U.S. at 751, 104 S.Ct. 3315. The constitutional and prudential standing requirements assure

that "the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge*, 454 U.S. at 472, 102 S.Ct. 752.

■ Closely akin to the standing requirement, and indeed not always clearly separable from it, is the ripeness doctrine. *See Louisiana Envtl. Action Network*, 87 F.3d at 1384 (discussing the overlapping relationship of the "threshold doctrines"). Under that doctrine, an Article III court cannot entertain the claims of a litigant unless they are "constitutionally and prudentially ripe." *Id.* at 1381. Article III does not allow a litigant to pursue a cause of action to recover for an injury that is not "certainly impending." *National Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C.Cir. 1996). Just as the constitutional standing requirement for Article III jurisdiction bars disputes not involving injury-in-fact, the ripeness requirement excludes cases not involving present injury. As the Supreme Court stated in *Whitmore v. Arkansas*, 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990), "[a]llegations of possible future injury do not satisfy the requirements of Art. III."

■ Like the standing doctrine, the ripeness requirement dictates that courts go beyond constitutional minima and take into account prudential concerns which in some cases may mandate dismissal even if there is not a constitutional bar to the exercise of our jurisdiction. In deciding whether an agency's decision is ripe for review, we must examine the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The Supreme Court has elaborated upon these requirements, concluding that courts must consider "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues

presented." *Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 118 S.Ct. 1665, 1670, 140 L.Ed.2d 921 (1998). The "primary focus" of the prudential aspect of the ripeness doctrine is to balance "the petitioner's interest in prompt consideration of allegedly unlawful agency action against the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting." *Eagle–Picher Indus. v. EPA,* 759 F.2d 905, 915 (D.C.Cir.1985).

Upon applying standing and ripeness analysis, we determine that WOC's procedural claim crosses the jurisdictional threshold, but its NEPA claim does not.

### A. WOC's NEPA Claim

 NEPA requires federal agencies to prepare a detailed EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also Fund for Animals v. Thomas,* 127 F.3d 80, 83 (D.C.Cir.1997). Under the statute, "[t]he EIS must include, among other things, a 'detailed statement' describing the reasonably foreseeable environmental impact both of the proposed federal action and of any feasible alternative(s) to the proposed federal action, including nonaction." *City of Grapevine, Tex. v. DOT,* 17 F.3d 1502, 1503 (D.C.Cir.1994) (quoting 42 U.S.C. § 4332(2)(C)). Under the regulations promulgated by the Council on Environmental Quality, federal agencies are responsible for "[d]esignating the major decision points for the agency's principal programs likely to have a significant effect on the human environment and assuring that the NEPA process corresponds with them." 40 C.F.R. § 1505.1(b). An agency need not conduct a comprehensive EIS if an "environmental assessment" reveals that the proposed action would not have a significant effect on the environment. 40 C.F.R. §§ 1501.4, 1508.9. Thus, the law does not require an agency to prepare an EIS until it reaches the critical stage of a decision which will result in "irreversible and irretrievable commitments of resources" to an action that will affect the environment. *Mobil Oil Corp. v. FTC,* 562 F.2d 170, 173 (2d Cir.1977). As the Second Circuit stated in *Mobil Oil Corp.,* "NEPA does not intend that [an agency] may be indefinitely delayed in undertaking its statutory duties by controversy over an EIS concerning events which may never occur." *Id.* Applying these principles in the context of leasing, we conclude that WOC has not established the irreversible and irretrievable commitment of resources necessary to establish ripeness, whether or not it has established the element of injury redressable in this litigation necessary to establish standing. However viewed, we do not have jurisdiction.

In *Sierra Club v. Peterson,* we held that when a federal agency charged with administering oil and gas leasing on federal lands has taken such action that it no longer "retain[s] the authority to preclude all surface disturbing activities" subsequent to issuing an oil and gas lease, "an EIS assessing the full environmental consequences of leasing must be prepared" before "commitment to any actions that might affect the quality of the human environment." 717 F.2d 1409, 1415 (D.C.Cir.1983). Based on this analysis, we concluded that "[i]f the [Forest Service] chooses not to retain authority to preclude all surface disturbing activities," an EIS must be prepared "when the leases are issued." *Id.; see also Conner v. Burford,* 848 F.2d 1441, 1451 (9th Cir.1988) ("[U]nless surface-disturbing activities may be absolutely precluded, the government must complete an EIS before it makes an irretrievable commitment of resources by selling non-NSO leases."). Concededly, the application of these principles does not necessarily presuppose that an obligation could not occur at an earlier stage. However, consistent with the purpose of NEPA as correctly described by the Second Circuit in *Mobil Oil Corp.,* it is not logical that the Service would be required to delay its undertakings and commit its resources to the preparation of an EIS which might ultimately prove unnecessary. Thus, we hold that the point of irreversible and irretrievable commitment of resources and the concomitant obligation to fully comply with NEPA do not mature until leases are issued.

In the instant case, WOC brought its NEPA action before any leases had actually been issued by the BLM. Therefore, WOC's NEPA challenge was premature. This does not preclude WOC from obtaining judicial relief should it later become appropriate. *See Louisiana Envtl. Action Network,* 87 F.3d at 1381. Indeed, once the leases were issued by the BLM, WOC was free to challenge the Forest Service's NEPA compliance. In fact, WOC has raised the NEPA compliance issue before the IBLA in its administrative protest of the BLM's offering of three Shoshone leases. However, that challenge would necessarily be a challenge to the state of the Forest Service's NEPA compliance *at the time of lease issuance.* The record before us is therefore incomplete since it represents the state of the Forest Service's NEPA compliance *at the time the Forest Service rendered its "specific lands" decision.* After that point, the Forest Service was free to undertake additional efforts to comply with its NEPA obligations, including efforts to make its EIS sufficiently site-specific. Until the point of irreversible and irretrievable commitment of resources had been reached—i.e., the leases had actually been issued—any challenge to the Forest Service's NEPA compliance by WOC or anyone else remained premature.

In addition to the constitutional restraints of the standing and ripeness doctrines, prudential considerations also support our conclusion that WOC's NEPA claim is premature. "Prudence ... restrains courts from hastily intervening into matters that may best be reviewed at another time or another setting, especially when the uncertain nature of an issue might affect a court's 'ability to decide intelligently.' " *Louisiana Envtl. Action Network,* 87 F.3d at 1382 (internal citations omitted) (quoting *American Trucking Ass'ns, Inc. v. ICC,* 747 F.2d 787, 790 (D.C.Cir.1984)). As the Supreme Court has noted, premature review " 'denies the agency an opportunity to correct its own mistakes and to apply its expertise.' " *Ohio Forestry,* 118 S.Ct. at 1671 (quoting *Federal Trade Comm'n v. Standard Oil Co.,* 449 U.S. 232, 242, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980)). The ripeness requirement is designed

to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Abbott Labs.,* 387 U.S. at 148–49, 87 S.Ct. 1507; *see also National Treasury Employees Union,* 101 F.3d at 1431 ("Prudentially, the ripeness doctrine exists to prevent the courts from wasting our resources by prematurely entangling ourselves in abstract disagreements...."); *New York State Ophthalmological Soc'y v. Bowen,* 854 F.2d 1379, 1386 (D.C.Cir.1988) ("A controversy is ripe if further administrative process will not aid in the development of facts needed by the court to decide the question it is asked to consider.").

■ Review of WOC's NEPA claim based on the record as it existed at the "specific lands" stage would not only violate the constitutional limitations on this Court's jurisdiction under Article III, but also would affect this Court's "ability to decide intelligently" whether the Forest Service met its NEPA obligations. WOC's NEPA claim is not "fit[ ] ... for judicial decision" as contemplated in *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. 1507. As the Supreme Court noted in *Ohio Forestry,* a claim is not ripe where the "possibility that further consideration will actually occur before [implementation] is not theoretical, but real." 118 S.Ct. at 1671. The Forest Service was free to engage in further efforts to fulfill its NEPA obligations before the leases were issued. Indeed, the verification process established by the Forest Service specifically contemplated further action on this front. Therefore, it is clear that WOC's NEPA compliance claim could not possibly be in a "concrete and final form," *Eagle–Picher,* 759 F.2d at 915, until the lease issuance stage, at which time it became ripe for review.

Moreover, under the second prong of the *Abbott Laboratories* test, withholding consideration of the NEPA claim at this stage in the proceedings will not result in any "hardship" to the parties. *See* 387 U.S. at 149, 87 S.Ct. 1507. There is no "hardship" here

since WOC may pursue its NEPA claim based on the Forest Service's compliance as of the date of lease issuance, and, indeed, it appears that it has done so before the IBLA. As a result, we must dismiss WOC's NEPA claim for lack of jurisdiction.

### B. WOC's Procedural Claim

██ In contrast, we conclude that we may exercise jurisdiction over WOC's procedural claim alleging that the Forest Service violated its own regulations. We first conclude that WOC has standing to bring its procedural claim. *See Lujan,* 504 U.S. at 561, 112 S.Ct. 2130; *Animal Legal Defense Fund, Inc. v. Glickman,* 154 F.3d 426, 431–32 (D.C.Cir.1998) (in banc); *Florida Audubon Soc'y v. Bentsen,* 94 F.3d 658, 664–65 (D.C.Cir.1996). While it is true for the reasons set forth above that there is no certainty that drilling will commence on the disputed lands, the procedural barrier which WOC alleges to have been breached no longer stands in the way. The land of concern is in genuine danger, though potentially shielded by the NEPA considerations which we have already held are not before us. Where the agency acting in obedience to its congressional mandate has erected that procedural barrier, and where the leasing process has reached the stage evidenced in this case, we hold that the impending threat of injury is sufficiently real to constitute injury-in-fact and afford constitutional standing to adjudicate the claimed procedural irregularity. *Cf. Whitmore,* 495 U.S. at 158, 110 S.Ct. 1717.

██ As the Supreme Court has stated, " 'procedural rights' are special." *Lujan,* 504 U.S. at 572 n. 7, 112 S.Ct. 2130. That is, "[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Id.* This does not mean—nor could it—that the plaintiff asserting the breach of a procedural right is not required to establish the constitutional minima of injury-in-fact, causation, and redressability. It only means that the necessary showing to support those minima is reduced. That is, in cases involving alleged procedural errors, "the plaintiff must show that the government

act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff." *Florida Audubon,* 94 F.3d at 664. This WOC has shown.

██ Therefore, we conclude that WOC's procedural claim is ripe. Unlike its NEPA claim, WOC's procedural claim has become "concrete and final," *Eagle–Picher,* 759 F.2d at 915, since there no longer exists the possibility that further agency action will alter the claim in any fashion. While the Forest Service may undertake further efforts to comply with NEPA, it has completely and finally implemented its procedures under 36 C.F.R. § 228.102(e). As the Supreme Court noted in *Ohio Forestry,* "a person with standing who is injured by a failure to comply with [some procedural requirement] may complain of that failure at the time the failure takes place, for the claim can never get riper." 118 S.Ct. at 1672; *see also Action for Children's Television v. FCC,* 59 F.3d 1249, 1258 (D.C.Cir.1995) (concluding that First Amendment challenge was ripe where there was "little or nothing more that the agency could do in a particular adjudication that would likely inform the court's decision on the question whether the enforcement scheme is currently being, or is capable of being, administered in accordance with the first amendment"). In this case, WOC's claim that the Forest Service procedures violate its own regulations "can never get riper." The Forest Service has implemented the procedures that WOC asserts are inconsistent with 36 C.F.R. § 228.102(e). Therefore, no further actions will be taken by the Forest Service that may be relevant to WOC's claim that the Forest Service violated its own regulations. As a result, WOC's procedural claim under 36 C.F.R. § 228.102(e) is ripe for review, and we may proceed to the merits.

### III. The Merits of the Procedural Claim

██ The heart of WOC's procedural claim is that the "subject to" language of § 228.102(e) imposes a requirement concerning the timing of the three findings mandated under the regulation, which the Forest Service has ignored. Relying upon both the text of the regulation itself and statements in the preamble, WOC asserts that the Forest Ser-

vice must make the three required findings *before* the BLM identifies specific parcels for leasing. In contrast, the Forest Service argues that the regulation imposes no such temporal requirement and that it is free to make the required findings after the BLM has identified specific parcels, as long as it does so before any leases are actually issued. Both WOC and the Forest Service have presented credible arguments indicating that the regulation is susceptible to either interpretation. Confronted with strong arguments on both sides and having determined that the regulation is ambiguous on its face, we must defer to the Forest Service's interpretation of its own regulations.

An agency's interpretation of its own regulations is entitled to substantial deference. *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *National Trust for Historic Preservation v. Dole,* 828 F.2d 776, 782 (D.C.Cir.1987). Our review in such cases is "more deferential ... than that afforded under *Chevron.*" *National Medical Enter. v. Shalala,* 43 F.3d 691, 697 (D.C.Cir.1995). The agency's construction of its own regulation is controlling "unless it is plainly erroneous or inconsistent with the regulation." *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977) (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)); *see also Thomas Jefferson,* 512 U.S. at 512, 114 S.Ct. 2381; *CSX Transp., Inc. v. STB,* 75 F.3d 696, 702 (D.C.Cir.1996). That "broad deference is all the more warranted when ... the regulation concerns 'a complex and highly technical regulatory program.'" *Thomas Jefferson,* 512 U.S. at 512, 114 S.Ct. 2381 (quoting *Pauley v. Beth Energy Mines, Inc.,* 501 U.S. 680, 697, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991)).

A court need not find that the agency's construction is the only possible one, or even the one that the court would have adopted in the first instance. *Belco Petroleum Corp. v. FERC,* 589 F.2d 680, 685 (D.C.Cir.1978); *Cold Spring Granite Co. v. Federal Mine Safety and Health Review Comm'n,* 98 F.3d 1376, 1378 (D.C.Cir.1996) ("The Secretary's plausible and sensible reading of his own regulation would prevail even if the company had presented an equally plausible alternative construction, which it has not."). So long as an agency's interpretation of ambiguous regulatory language is reasonable, it should be given effect. *See Martin v. Occupational Safety & Health Review Comm'n,* 499 U.S. 144, 150, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991). Thus, "in a competition between possible meanings of a regulation, the agency's choice receives substantial deference." *Rollins Envtl. Servs. (NJ), Inc. v. EPA,* 937 F.2d 649, 652 (D.C.Cir.1991).

WOC argues that the Forest Service's interpretation of its oil and gas leasing regulations is contrary to the plain language of the regulatory text because it allows the Forest Service to authorize leasing of specific lands without first making the three findings required under 36 C.F.R. § 228.102(e). WOC relies on the language of 36 C.F.R. § 228.102(e), which states that "[a]t such time as specific lands are being considered for leasing," the Forest Service shall authorize the BLM to offer specific lands for lease "subject to" the requirements enumerated in the regulation. WOC interprets the "subject to" language as meaning that the requirements laid out in the regulation must be met *before* authorization is given. It further argues that the Forest Service's interpretation cannot be correct because the regulation provides for additional NEPA compliance "*before* a leasing decision for specific lands will be made." *Id.* (emphasis added). Finally, WOC argues that the preamble of the regulations is evidence of the Forest Service's contemporaneous intent. WOC notes that the preamble states that the Forest Service "will make a decision as to whether to authorize" leasing "[o]nce a conclusion is made with respect to each of the three required determinations" and that "[t]he only lease(s) that the Bureau of Land Management shall be authorized to offer are those for which the Forest Service has [made the required findings]." 55 Fed.Reg. 10,423, 10,430 (Mar. 21, 1990). WOC further observes that the preamble indicates that specific "tracts" will be identified before authorization is given, stating: "When those tracts are identified,

the Forest Service will decide whether to authorize the Bureau of Land Management to offer the lease(s)." *Id.* at 10,429.

WOC is correct that the regulation at issue is ambiguous. Clearly it is subject to an interpretation different than that offered by the Forest Service. But WOC has not established that the Forest Service's interpretation of its own regulation is "plainly erroneous." The regulation states that the "specific lands" decision is "subject to" three requirements. While the most natural reading of the "subject to" phrase may be that the three requirements will be met *before* the "specific lands" decision is made, the alternative reading—that the three requirements may be verified after the "specific lands" decision is made, but before the decision is implemented and leases for specific parcels are approved—is not "plainly erroneous." The "subject to" phrase does not necessarily indicate when the required determinations will be made. The language of the regulation therefore is consistent with an interpretation under which the verification process follows a determination to authorize the BLM to offer specific lands for leasing.

Similarly, the surrounding regulatory text does not indicate that the Forest Service's construction is plainly erroneous. The regulation states that any additional environmental analysis shall be conducted "before a leasing decision for specific lands will be made." 36 C.F.R. § 228.102(e)(1). This language may be interpreted as dictating that additional environmental analysis occur before (1) the Forest Service authorizes the BLM to identify specific parcels for leasing (as WOC contends) or (2) the Forest Service consents to the sale of leases after completing its "verification" procedures (as the Forest Service contends). Although WOC's interpretation may be the most reasonable, and indeed may even be the interpretation this Court would adopt were it reviewing the regulation *de novo*, it is not the only reasonable interpretation available. Consequently, we cannot invalidate the procedures established by the Forest Service since they are consistent with one of the reasonable interpretations flowing from the admittedly ambiguous regulatory text.

 WOC's appeal to the language in the preamble of the regulation is equally unavailing. While language in the preamble of a regulation is not controlling over the language of the regulation itself, *Jurgensen v. Fairfax County, Va.,* 745 F.2d 868, 885 (4th Cir.1984), we have often recognized that the preamble to a regulation is evidence of an agency's contemporaneous understanding of its proposed rules. *See, e.g., Chemical Mfrs. Ass'n v. DOT,* 105 F.3d 702, 708 (D.C.Cir. 1997); *Booker v. Edwards,* 99 F.3d 1165, 1168 (D.C.Cir.1996). Indeed, in the analogous context of statutory construction, we have noted that, although the language in the preamble of a statute is "not an operative part of the statute," it may aid in achieving a "general understanding" of the statute:

> [The] preamble no doubt contributes to a general understanding of a statute, but it is not an operative part of the statute and it does not enlarge or confer powers on administrative agencies or officers. Where the enacting or operative parts of a statute are unambiguous, the meaning of the statute cannot be controlled by the language in the preamble. The operative provisions of statutes are those which prescribe rights and duties and otherwise declare the legislative will.

*Association of Am. Railroads v. Costle,* 562 F.2d 1310, 1316 (D.C.Cir.1977). The principles governing interpretation of the preamble of a regulation are no different. Although the preamble does not "control" the meaning of the regulation, it may serve as a *source of evidence* concerning contemporaneous agency intent.

The preamble language at issue here is as ambiguous as the regulatory text. For example, the preamble states that the "decision as to whether to authorize the [BLM] to offer lease(s) for the specified [NFS] lands" will be made "[o]nce a conclusion is made with respect to each of the three required determinations." 55 Fed.Reg. 10,423, 10,430 (Mar. 21, 1990). On its face, this language seems to indicate that the three factual determinations specified in 36 C.F.R. § 228.102(e) must be made *at the time* the "specific lands" decision is made, and not after. Nevertheless, this passage can also be read as stating

that the three factual determinations will be made before the Forest Service gives its consent to issuing leases for specific parcels of land. The term "lands" as used in this passage is ambiguous. At times, the preamble uses it to refer generally to the lands under review during the leasing analysis stage. At other times, however, the preamble uses this phrase to refer to the specific parcels for which leases are issued by the BLM. Generally, when the Forest Service intends to convey this latter meaning, it couples the term "lands" with the modifier "specified." Thus, in the above passage, the phrase "specified [NFS] lands" can be read as referring to specific parcels. Under this interpretation, the passage merely states that the three factual determinations will be made by the Forest Service before it consents to the BLM's issuance of any leases on specific parcels. The verification procedure followed by the Forest Service is therefore consistent with this interpretation of the preamble language. The other passages cited by WOC are similarly ambiguous and susceptible to an interpretation consistent with the Forest Service procedures.

In sum, we agree with the district court's conclusion that WOC has "presented a reasonable alternative reading of" the regulations at issue. *Wyoming Outdoor Council,* 981 F.Supp. at 19. Nonetheless, we also conclude, as did the district court, that the agency's interpretation is not "at odds with either the overall structure or the specific language of the regulation." *Id.* Therefore, given the deference normally accorded such agency interpretations, we must uphold the Forest Service's reading of its admittedly ambiguous regulations.

### IV. Conclusion

Having concluded that the Forest Service's interpretation of its own regulations is not plainly erroneous, we affirm the judgment of the district court upholding the Forest Service's leasing decision and dismiss WOC's NEPA claim for lack of jurisdiction.