# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 20-5094**

**September Term, 2020**

FILED ON: MAY 20, 2021

FISHERIES SURVIVAL FUND, ET AL.,
     APPELLANTS

GARDEN STATE SEAFOOD ASSOCIATION,
     APPELLEE

v.

DEBRA A. HAALAND, SECRETARY OF THE INTERIOR, ET AL.,
     APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-02409)

Before: TATEL and MILLETT, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

## J U D G M E N T

This appeal from the United States District Court for the District of Columbia's orders granting appellees' motion for summary judgment and denying appellants' motion to alter or amend was presented to the court and briefed and argued by counsel. The court has accorded the issues full consideration and has determined that they do not warrant a published opinion. *See* D.C. Cir. R. 36(d). For the reasons stated below, it is hereby

**ORDERED** and **ADJUDGED** that the judgment of the district court be affirmed.

Appellants, organizations of fishermen and seaside municipalities, challenge the Bureau of Ocean Energy Management's (BOEM) decision to issue an offshore lease for a windfarm off the coast of New York. They bring claims under the National Environmental Policy Act (NEPA) and the Outer Continental Shelf Lands Act (OCSLA). The district court dismissed the former claims as unripe and the latter for failure to comply with OCSLA's pre-suit notice provision. We affirm on the same grounds.

"[A]n agency's NEPA obligations mature only once it reaches a critical stage of a decision which will result in irreversible and irretrievable commitments of resources to an action that will

affect the environment." *Center for Biological Diversity v. Department of the Interior*, 563 F.3d 466, 480 (D.C. Cir. 2009) (internal quotation marks omitted). This is a question of "ripeness." *Wyoming Outdoor Council v. United States Forest Service*, 165 F.3d 43, 49 (D.C. Cir. 1999). In *Sierra Club v. Peterson*, we explained that the issuance of an energy lease triggers NEPA unless the lease "reserves both the authority to preclude all activities pending submission of site-specific proposals and the authority to prevent proposed activities if the environmental consequences are unacceptable." 717 F.2d 1409, 1415 (D.C. Cir. 1983) (emphasis omitted).

The lease in this case satisfies both requirements. First, the lease declares that it "does not, by itself, authorize *any activity* within the leased area." Lease § 2(a) (emphasis added). Rather, the lease merely grants to Equinor, the lessee,

> the exclusive right and privilege . . . to: (1) submit to the Lessor [BOEM] for approval a Site Assessment Plan (SAP) and Construction and Operations Plan (COP) for the project identified in . . . this lease; and (2) conduct activities in the area identified in . . . this lease . . . that are described in a SAP or COP that has been approved by the Lessor.

*Id.* Second, the lease states that "[t]he Lessor will decide whether to approve a SAP or COP in accordance with the applicable regulations in 30 CFR Part 585" and that "[t]he Lessor retains the right to disapprove a SAP or COP based on the Lessor's determination that the proposed activities would have *unacceptable environmental consequences*[ or] would conflict with one or more of the requirements set forth in" OCSLA or applicable regulations. *Id.* § 3(b) (emphasis added).

The lease thus "reserves both the authority to preclude all activities pending submission of site-specific proposals"—a SAP or COP—and "the authority to prevent proposed activities"—by rejecting the SAP or COP—"if the environmental consequences are unacceptable." *Peterson*, 717 F.2d at 1415 (emphasis omitted). Accordingly, the lease did not trigger the Bureau's NEPA obligations.

Appellants' counterarguments are unavailing. They seize on language in post-*Peterson* energy lease precedents stating that "'the point of irreversible and irretrievable commitment of resources and the concomitant obligation to fully comply with NEPA do not mature until leases are issued.'" *Center for Biological Diversity*, 563 F.3d at 480 (quoting *Wyoming Outdoor Council*, 165 F.3d at 49). But these decisions did not overrule *Peterson*, nor could they. They addressed NEPA challenges that were unripe because they were brought "before any leases had actually been issued." *Wyoming Outdoor Council*, 165 F.3d at 50; *see also Center for Biological Diversity*, 563 F.3d at 480. Unlike *Peterson*, neither examined under what circumstances an energy lease constitutes an irreversible and irretrievable commitment of resources for NEPA purposes. At most, the language appellants cite reflects only the expectations that the issuance of a lease under those particular programs would trigger NEPA.

Appellants also rely on *Public Employees for Environmental Responsibility v. Hopper* (*PEER*), which reached the merits of a NEPA challenge to an offshore windfarm lease. 827 F.3d

1077, 1083 (D.C. Cir. 2016). *PEER*, however, never mentioned, let alone evaluated, the ripeness of the NEPA claims. The closest it came was its observation that "[t]he Bureau does not contest that issuing a renewable energy lease constitutes a major federal action." *Id.* "We do not set jurisdictional precedents *sub silentio*." *Center for Sustainable Economy v. Jewell*, 779 F.3d 588, 600 (D.C. Cir. 2015). In any event, the lease in *PEER* was issued under different regulations and, in contrast to the lease here, lacked terms explicitly reserving to the Bureau the right to prevent proposed activities if the Bureau predicted unacceptable environmental consequences.

Appellants argue that the lease fails the *Peterson* test because it grants Equinor the right to obtain easements that could exclude appellants' members or residents. But this line of reasoning rests on a misreading of the lease. Rather than granting easements at the outset, the lease allows Equinor to request easements only "[a]s part of submitting a COP for approval," and goes on to state that requested easements will only be granted "upon approval of the COP." Lease § 6.

Appellants contend that post-lease developments demonstrate that the lease issuance was a significant enough event to trigger NEPA. They observe that some states and private entities had entered into agreements in anticipation of the wind farm's construction. Appellants also cite a 2019 statement made by the Bureau in connection with another project that they interpret as indicating the Bureau's belief that eventual approval of the wind farm "is reasonably foreseeable." Appellants' Br. 46–47 (emphasis omitted) (internal quotation marks omitted). But the apparent expectations of third parties, and even the Bureau itself, hardly constitute an "irreversible and irretrievable commitment of resources," the critical issue for NEPA ripeness purposes. *Wyoming Outdoor Council*, 165 F.3d at 49.

Finally, appellants seek to distinguish *Peterson* and its progeny on the grounds that those cases involved terrestrial oil and gas leases, which, in their view, do not require a significant upfront commitment from the developer. Observing that Equinor spent $42 million on the lease in this case and will expend more resources in developing a SAP and COP, appellants argue that, as a practical matter, the Bureau will never find the leased site unsuitable for a windfarm regardless of the environmental consequences. In other words, they believe that the Bureau has at least made a *de facto* commitment to allowing a windfarm on the site, even if it retains the legal authority to block any development. Federal agencies, however, receive a "presumption of regularity" in their dealings. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). Moreover, the lease's cost was not the Bureau's doing, but rather the result of an auction that drew so many bids, it took over a day to complete. And Equinor's willingness to risk so much money on the lease may reflect the completed windfarm's potential profitability rather than the likelihood of the project's ultimate approval. In short, we see nothing to suggest that the Bureau has committed to authorizing a windfarm on the leased site.

We also agree with the district court that appellants failed to satisfy OCSLA's pre-suit notice provision, and therefore decline to address whether their OCSLA claims are likewise unripe. *See Friends of Animals v. Ashe*, 808 F.3d 900, 903, 905 n.2 (D.C. Cir. 2015) (affirming dismissal for failure to comply with a materially similar notice provision without deciding a jurisdictional question). OCSLA provides that "no action may be commenced under [the act] . . . prior to sixty days after the plaintiff has given notice of the alleged violation, in writing under oath, to," among

others, "the Secretary and any other appropriate Federal official." 43 U.S.C. § 1349(a)(2)(A). The statute contains an exception to the sixty-day waiting period for "any case in which the alleged violation . . . would immediately affect a legal interest of the plaintiff." *Id.* § 1349(a)(3).

Appellants never claim that they complied with the sixty-day waiting period. Indeed, it is undisputed that they gave notice dated December 1, 2016, but initiated this action just seven days later. Instead, they argue that the lease auction on December 15 and 16 "immediately affect[ed]" their "legal interest," thereby excusing them from the pre-suit notice provision. *Id.* But as explained above, the lease authorized no activity, much less immediately affected appellants' legal interests. And regardless, Equinor and the Bureau were not able to execute the lease until March of 2017 due to various mandatory waiting periods. Appellants therefore have no excuse for failing to wait sixty days after they gave notice.

We have reviewed appellants' remaining arguments and find them too without merit.

The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or petition for rehearing en banc. *See* Fed. R. App. P. 41(b); D.C. Cir. R. 41.

**<u>Per Curiam</u>**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:    /s/
Daniel J. Reidy
Deputy Clerk