CITY OF WILLIAMS, et al., Plaintiffs,

v.

Michael DOMBECK, et al., Defendants.

No. CIV.A. 00–0066 CKK.

United States District Court,
District of Columbia.

March 30, 2001.

Geraldine Edens, Cadwalader, Wickersham & Taft, Washington, DC, for plaintiffs.

Wells Daniels Burgess, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, Albert C. Lin, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for Michael Paul Dombeck, in his capacity as Chief of the United States Forest Service, Eleanor Towns, in her capacity as Regional Forester of the United States Forest Service, federal defendants.

Jay Kelly Wright, Arnold & Porter, Washington, DC, for Canyon Forest Village II Corporation.

David H. Getches, Boulder, CO, for Natural Resources Defense Council, Inc., National Parks and Conservation Association, and The Grand Canyon Trust.

Harry Rubenstein Sachse, Sonosky, Chambers, Sachse & Endreson, Washington, DC, for Havasupai Tribe and The Hopi Tribe.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

This case comes before the Court on cross-motions for summary judgment.

Plaintiffs have brought this action against various government officials, challenging the decision of the United States Forest Service to approve a land exchange between itself and Canyon Forest Village, Inc. Plaintiffs' claims can be divided into two general categories: (1) claims under the Federal Land Policy and Exchange Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*, and (2) claims under the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.* All the land involved is located on the outskirts of the Grand Canyon National Park in Northern Arizona. For reasons elaborated below, the Court finds that Plaintiffs' claims under FLPMA must be dismissed as they are not ripe for review. The Court further concludes that Defendants are entitled to summary judgment with respect to the NEPA claims set forth in Counts IV, V, and VII of Plaintiffs' Complaint. The Court correspondingly concludes that Plaintiffs are entitled to Summary Judgment with regard to the NEPA claims set forth in Count III of their Complaint.

## I. BACKGROUND

Tusayan, Arizona is an unincorporated community of 144 acres in Coconino County that is surrounded by Kaibab National Forest. Compl. ¶ 29. Because Tusayan is located one mile south of Grand Canyon National Park, many National Park visitors use the Tusayan facilities while visiting the National Park. *Id.* ¶¶ 29, 30. In order to accommodate these visitors, the United States Forest Service created a Final Environmental Impact Statement ("FEIS") to evaluate the impact of various proposals to improve the Tusayan facilities. *Id.* ¶ 30. The FEIS focused on expanding the community by obtaining some of the 12 parcels of land in Kaibab National Forest, which are owned by Canyon Forest Village II Corporation ("CFV") and are surrounded by National Forest Service

("NFS") land. FEIS at 1. At least three of these parcels were considered "likely candidates for development." *Id.* Thus, the Forest Service sought to develop some sort of planned exchange and development to prevent the piecemeal development of parcels within the Kaibab National Forest that would likely have a negative impact on NFS land. *Id.*

In particular, the Forest Service studied eight alternatives that evaluated whether the Forest Service should use the National Forest Service land to expand the Tusayan community. Compl. ¶ 31. The alternatives varied as to quantity and location of the land which could potentially be used for the development and expansion. *Id.* ¶ 30. After scrutinizing all of the alternatives, the Forest Service chose to implement Alternative H. *Id.* ¶¶ 32, 33. Alternative H, which was created by CFV, proposed a land transaction between the Forest Service and CFV, with the Forest Service providing 272 acres of NFS land located north of Tusayan to CFV in exchange for twelve inholdings totaling approximately 2,118 acres. *Id.* ¶ 39. With the land it receives under this exchange, CFV proposes to construct a large shopping center, consisting of hotel, retail, food and beverage, and office space. *Id.* ¶ 40. The Forest Service chose this alternative because it determined that Alternative H served the public interest and met the objectives set forth in the Forest Plan. *Id.* ¶ 33.

The Plaintiffs in this case—two municipal corporations, a non-profit corporation, a limited liability company, and several individuals residing in or near Tusayan—have filed suit under the Administrative Procedure Act seeking judicial review of the Forest Service's decision to proceed with Alternative H. *Id.* ¶¶ 3–28. The Plaintiffs claim that the selection of Alternative H violates the National Environ-

mental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Federal Land Policy Exchange Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.* *Id.* ¶¶ 92–156. CFV has been permitted to intervene in this action. *See City of Williams, Arizona v. Dombeck*, No. 00–66 (D.D.C. August 17, 2000) (order granting CFV's motion to intervene).

On March 15, 2000, the County Board of Supervisors for Coconino County approved a CFV-requested zoning ordinance. However, "the ordinance and the land transfer ... was [sic] stayed pending a referendum held in Coconino County on November 7, 2000." Pl. Supp. Reply Mem. in Supp. of Cross Mot. for Sum. J. (Pl.Supp.Reply.) at 1. The November 7, 2000, referendum stated that the ordinance "amend[ed] the county zoning map on application of the U.S. Forest Service by [CFV] for a zone change from 'open space' to 'planned community' on 272 acres located south of the Grand Canyon, allowing lodging, retail, employee housing, and community facility uses, with 63 conditions." *Id.* at 2 (quoting Sample Ballot, Ex. A). The ballot further stated:

> A "Yes" vote shall have the effect of ALLOWING the Canyon Forest Village development on the subject property as approved by the County Board of Supervisors.
> A "No" vote shall have the effect of REJECTING the rezoning request as approved by the County Board of Supervisors and retaining the "open space" designation for the subject property.

*Id.* (quoting Sample Ballot, Ex. A). The certified results of the above-described referendum ballot show that "No" defeated "Yes" by a total of 24, 417 to 13, 817 votes. *Id.* (citing Ex. B). "As a result, the Board of Supervisor's decision has been invalidated and there is no zoning for any aspect of the lands encompassed by Alternative H other than as 'open space.'" *Id.* Coconino County Zoning Ordinances prohibit CFV from seeking rezoning on the same parcel for at least one year following the denial by the voters. *Id.* (citing Coconino Zoning Ordinance § 19.4–12).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment should be granted pursuant to Fed.R.Civ.P. 56 only if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling upon a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bayer v. United States Dep't of Treasury*, 956 F.2d 330, 333 (D.C.Cir.1992). Likewise, in ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *See Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir.1975). Summary judgment is also appropriate where, as here, review is on the administrative record. *See, e.g., Richards v. INS*, 554 F.2d 1173, 1177 n. 28 (D.C.Cir.1977).

## III. ANALYSIS

As mentioned above, Plaintiffs' claims can be divided into two general categories: (1) claims under FLPMA and (2) claims under NEPA. The Court will address each category in turn.

### A. Claims under FLPMA

Counts I and II of Plaintiffs' Complaint present claims under 43 U.S.C. § 1716.

Count I asserts that the Alternative H does not comport with the requirement in Section 1716(b) that the values of the lands exchanged by the Forest Service either "be equal, or if they are not equal, the values shall be equalized by the payment of money ... so long as the payment does not exceed 25 per centum of the total value of the lands or interests transferred out of Federal ownership." 43 U.S.C. § 1716(b). Pursuant to this provision, Plaintiffs attack the property appraisals relied upon by the Forest Service to value the relevant parcels of land. Compl. ¶¶ 95–101. Count II alleges that the Forest Service erroneously concluded that the "public interest will be served by making" the proposed land exchange and in doing so, violated 43 U.S.C. § 1716(a). *Id.* ¶¶ 105–10.

■ Although neither party addresses the issue in their filings, the Court is concerned that Plaintiffs' claims under FLPMA are not ripe for review. The Court's concern in this regard flows directly from the outcome of the November 7, 2000, referendum which denied the zoning necessary to fully implement the plans anticipated in Alternative H. Because ripeness is a jurisdictional requirement, it is entirely appropriate for the Court to raise this issue *sua sponte. See Wyoming Outdoor Council v. United States Forest Service,* 165 F.3d 43, 48 (D.C.Cir.1999) ("Just as the constitutional standing requirement for Article III jurisdiction bars disputes not involving injury-in-fact, the ripeness requirement excludes cases not involving

present injury."); *Metzenbaum v. FERC,* 675 F.2d 1282, 1289–90 (D.C.Cir.1982) ("Ripeness doctrine is drawn both from Article III limitations on judicial power and discretionary reasons of policy for refusing to exercise existing power.").[1]

The judicial power extends only to "Cases" and "Controversies." *Nat'l Treasury Employees Union v. U.S.,* 101 F.3d 1423, 1427 (D.C.Cir.1996) (quoting U.S. Const. art. III, § 2). "In an attempt to give meaning to Article III's case-or-controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,' among which are standing ripeness, mootness, and the political question doctrine." *Id.* (quoting *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). The *National Treasury Employees Union* court explained that "[r]ipeness, while often spoken of as a justiciability doctrine distinct from standing, in fact shares the constitutional requirement of standing that an injury in fact be certainly impending." *Id.* (citing *Duke Power Co. v. Carolina Envtl. Study Group,* 438 U.S. 59, 81, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *DKT Mem'l Fund, Ltd. v. Agency for Int'l Dev.,* 887 F.2d 275, 297 (D.C.Cir.1989) (holding that "the constitutional requirement for ripeness is injury in fact")). Thus, "[i]t is only the prudential aspect of ripeness—where a court balances 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consider-

---

1. In their filings subsequent to the November 7, 2000, referendum decision, both of the parties assert that the referendum decision does not render the instant case moot. *See* Pl. Supp. Reply Mem. at 2 ("the defeated ordinance ... does not moot this case because CFV could seek rezoning in the future"); Defs.' Joint Supp. Reply Mem. at 2 ("The referendum does not affect the Court's resolution of Plaintiffs' claims because it does not alter the Forest Service record of decision

("ROD"), the conditions imposed on it, or the administrative record."). While the parties are likely correct that the November 7, 2000, referendum does not moot this case, mootness is distinct from ripeness, or as stated by the Eleventh Circuit "our conclusion that the issues presented on appeal are not moot does not automatically suggest that the appeal is ripe for adjudication." *See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta,* 219 F.3d 1301, 1315 (11th Cir.2000).

ation,'—that extends beyond standing's constitutional core." *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)).

With regard to Plaintiffs FLPMA claims, the Court is concerned with both the constitutional concerns relevant inherent in a ripeness inquiry, as well as the prudential concerns. The Court will consider each seriatim.

### 1. Ripeness—Article III Requirements

The "injury in fact" requirement requires the Plaintiff to have suffered "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotes and citations omitted). In the instant case, Plaintiffs seek declaratory relief on the assertion that Alternative H includes an improper land appraisal in violation of 43 U.S.C. § 1716(b) and that the determination that Alternative H was in the public interest violates 42 U.S.C. § 1716(a). *See* Compl., Counts I and II. Plaintiffs' also seek an injunction prohibiting consummation of the land exchange to enforce the declaratory judgment. *See* Compl., Count VIII.

Although the injuries that may result if Plaintiffs can prove the assertions in Counts I and II appear to be "concrete and particularized," the November 2000 zoning decision ensures that these potential injuries are far from being "actual or imminent." *See Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. Defendants, in their Revised Memorandum of Points of Law and Authority in Support of Defendants' Motion for Summary Judgment ("Def.Mem."), indicate that "the Forest Service's decision [ ] provides that the transfer of land titles and recording of deeds will not occur until County zoning is in place on the land." Def. Mem. at 10 (citing Record of Decision ("ROD")) at 24, 26–27. Intervenor CFV confirms this assessment in its own Statement of Points and Authorities in Support of Defendants' Motion (Intervenor Mem.) stating that "[t]he ROD specifies that the transfer of federal land to CFV will not occur until County zoning is in place . . . ." Intervenor Mem. at 11 (citing ROD at 24, 26). Plaintiffs concede as much, in their Supplemental Reply Memorandum in Support of Plaintiffs' Cross–Motion for Summary Judgment. Pl. Supp. Reply at 2 (indicating that failure to obtain zoning, "precludes CFV from completing the land exchange"). Thus, there is no dispute—without zoning, the Forest Service's decision to exchange land pursuant to Alternative H cannot be completed, *i.e.*, there can be no transfer of title, nor any recording of deeds.

The injuries alleged in Counts I and II cannot be ripe unless the transfer of title in the challenged land exchange is actual or imminent. There has, to date, been no transfer, so there is no actual injury. Moreover, the transfer will only be imminent following rezoning. At this stage, CFV may not even apply for rezoning until November, 2001, at the earliest, and even then, there is no indication that CFV or the Forest Service will then be able to convince the voters or the County Board of Supervisors that zoning should be granted. In the interim, it seems quite possible that, in light of the potentially permanent impediment posed by zoning, the Forest Service may reconsider its decision to proceed with Alternative H. Consequently, the injury Plaintiffs anticipate upon the transfer of land titles is not yet ripe, as there is no certainty as to when Plaintiffs will suffer this injury, nor that they will ever suffer this injury. Plaintiffs' anticipated injury is, at this point, based entirely upon specu-

lation [2] and conjecture, and as such, cannot suffice to satisfy Article III's ripeness requirement. *See Nat'l Treasury Employees Union,* 101 F.3d at 1431.

### 2. Ripeness—Prudential Considerations

 The *National Treasury Employees Union* court explained that the prudential portion of the ripeness doctrine "exists to prevent the courts from wasting our resources by prematurely entangling ourselves in abstract disagreements, and where . . . other branches of government are involved, to protect the other branches from judicial interference until their decisions are formalized and their "effects felt in a concrete way by the challenging parties." " *Id.* A court testing for prudential ripeness should evaluate (1) the fitness of the issue for judicial decision and (2) the hardship to the parties of withholding court consideration. *Wyoming Outdoor Council,* 165 F.3d at 48; *see also Nat'l Treasury Employees Union,* 101 F.3d at 1431 (citing *Abbott Labs.,* 387 U.S. at 149, 87 S.Ct. 1507); *see also Ohio Forestry Assn., Inc. v. Sierra Club,* 523 U.S. 726, 733, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998) (reciting the same two factors, and then elaborating upon them by examining whether delayed review would cause hardship to the plaintiffs, whether judicial intervention would inappropriately interfere with further administrative action, whether the courts would benefit from further factual development of the issues presented); *Texas v. United States,* 523 U.S. 296, 301, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998)

(reciting the same two factors and citing to *Abbott Labs.,* 387 U.S. at 149, 87 S.Ct. 1507).

Addressing the "fitness of the issue," it does appear that the specifics of the land exchange proposed in Alternative H are sufficiently concrete for the Court to address the merits of the challenge. Certainly, one cannot say that the review requested by Plaintiffs involves "abstract disagreements over administrative policies." *Abbott Labs.,* 387 U.S. at 148, 87 S.Ct. 1507. However, to address the specifics of the plan, regardless of how firm the details, at this point, threatens to waste judicial resources evaluating a plan which faces a potentially insurmountable obstacle. Moreover, the obstacle posed by zoning is wholly outside of the control of the agency. That is to say that there is little, short of abandoning or altering the challenged plan, that the agency can do to facilitate the re-zoning process.

The analysis of the fitness of the present issue for judicial review necessarily flows into the impact of non-review upon the parties. In this case, there will be virtually no impact upon the parties by a refusal to consider Plaintiffs' claims at this early stage. As stated previously, the status quo is frozen, at least with regard to Alternative H, until CFV can obtain zoning. Plaintiffs' own filing indicates that CFV cannot even reapply for zoning until November 2001. *See* Pl. Supp. Reply at 2 (citing Coconino County Zoning Ordinance § 19.4–12). If and when CFV does obtain

---

**2.** In this regard, Plaintiffs' anticipated injury is similar to the one addressed in *National Treasury Employees Union.* In that case, the Union appealed from the dismissal of their suit challenging the constitutionality of the Line Item Veto Act. The Union filed a declaratory judgment suit challenging the line-item veto power as soon as the statute was signed into law. *Nat'l Treasury Employees Union,* 101 F.3d at 1425–26. The Court of Appeals

found the claim to be unripe because the veto power being challenged was "not only unexercised, but is as yet unavailable." *Id.* at 1431. By comparison, Plaintiffs' anticipated injury in this case is even more speculative, as not only has the transfer of titles not yet taken place, but without proper zoning, the Forest Service is without power to proceed with its plan to transfer.

zoning, Plaintiffs' claims will then be ripe and they may refile this suit if they so desire, but at this point, a ruling by the Court would have little, if any, practical impact upon the parties.[3]

Also supporting the prudential determination that Plaintiffs' FLPMA claims are not ripe is the "usually unspoken element of the rationale underlying the ripeness doctrine: If we do not decide it now, we may never need to." *Nat'l Treasury Employees Union*, 101 F.3d at 1431. The Supreme Court formally recognized this long "unspoken" factor when it stated that "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas*, 523 U.S. at 300, 118 S.Ct. 1257 (internal quotes omitted). Because zoning is an unavoidable condition precedent to the consummation of the land exchange, one cannot say with any degree of certainty that the question posed by Plaintiffs will, indeed, ever become ripe for adjudication. As judicial resources are best preserved for conflicts necessitating a resolution, rather than expended upon conflicts merely *anticipating* the need for judicial intervention, prudence dictates against addressing the merits of Plaintiffs' FLPMA claims at this point.

### B. NEPA Claims

In general terms, counts III, IV, V, and VII[4] of Plaintiffs' Complaint allege that the Forest Service's decision to adopt Alternative H violates NEPA. Count III asserts that the FEIS is inadequate because it "fails to consider the impacts of constructing and operating the water delivery system proposed in Alternative H." Compl. ¶¶ 111–119. Count IV alleges that the Forest Service failed to comply with Section 1508.25 of the regulations published by the Council on Environmental Quality (CEQ) which require the Forest Service to consider "connected," "cumulative," and "similar" actions in the same Environmental Impact Statement ("EIS"). Compl. ¶¶ 120–127. Plaintiffs' fifth claim for relief (Count V) alleges that the FEIS did not properly analyze the full scope of alternatives and that this failure violates 40 C.F.R. § 1502.14. Compl. ¶¶ 128–134. Count VII alleges that the Regional Forester, Eleanor Towns, violated the Agency's regulations in conjunction with the informal appeals process. Compl. ¶¶ 135–144.

■ Plaintiffs' claims under NEPA do not necessarily present the same ripeness problems as Plaintiffs' claims under the FLPMA. This is so because "NEPA, unlike the [FLPMA], simply guarantees a particular procedure, not a particular result. Hence a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." *Ohio Forestry Ass'n*, 523 U.S. at 737, 118 S.Ct. 1665 (comparing NEPA with the National Forest Management Act); *compare* 43 U.S.C. § 1716 (requiring that the values of the lands exchanged be equal and in the public interest), *with* 42 U.S.C. § 4332 (requiring that agencies prepare environmental impact statements where major agency action would significantly affect the environment).

---

3. Of course, the Court recognizes that a ruling in Plaintiffs' favor will likely ensure that Alternative H will not proceed as planned. Nonetheless, Alternative H is not currently proceeding as planned, nor will it for at least nine months. Thus, even a favorable ruling from the Court at this time will not have any real effect upon the parties.

4. Plaintiffs' sixth cause of action (Count VI), also a claim under NEPA, has been voluntarily dismissed.

NEPA was enacted to regulate government activity that significantly impacts the environment and "to help public officials make decisions that are based on an understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c). As such, NEPA is the "basic national charter for protection of the environment." *Id.* § 1500.1(a). The Council on Environmental Quality ("CEQ") administers NEPA and promulgates regulations related to NEPA that are binding on federal agencies. *See* 42 U.S.C. §§ 4342, 4344(3); 40 C.F.R. §§ 1501–08. Every federal agency then drafts its own administrative regulations to implement and supplement the CEQ regulations. *See* 40 C.F.R. § 1507.3. To effectuate the goals of NEPA, the CEQ created rules requiring agencies to establish implementing procedures that facilitate the evaluation of management decisions and the environmental effects of proposed federal agency actions. Under these guidelines, an agency must identify those actions which normally require an environmental impact statement, or "EIS." *See* 40 C.F.R. § 1501.4(a)(1). An EIS is required for "major federal actions significantly affecting the quality of the environment." 40 C.F.R. § 1502.4. The report itself is a detailed analysis and study conducted to determine if, or the extent to which, a particular agency action will impact the environment. "Upon review of the EIS, [the Court's] job is to ensure that the agency took a 'hard look' at the environmental consequences of its decision to go forward with the project." *City of Grapevine, Texas v. Dep't of Transp.*, 17 F.3d 1502–04 (D.C.Cir.1994) (quoting *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 294 (D.C.Cir.1988)).

■ The agencies, themselves, have the primary responsibility to comply with NEPA. As long as an agency has taken a "hard look" at an action and has followed NEPA's procedures, a court will not overturn an agency's substantive decision unless it is arbitrary, capricious, or an abuse of discretion.[5] *See Marsh v. Oregon Nat-*

---

5. Because NEPA does not set forth a standard of review, the standard is that under the APA. Under the Administrative Procedure Act ("APA"), a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In reviewing whether agency action was arbitrary and capricious, the Court is deferential to the administrative agency, *see Environmental Defense Fund, Inc., v. Costle*, 657 F.2d 275, 282 (D.C.Cir.1981); *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C.Cir.1976) (en banc), and presumes the agency action to be valid. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Moreover, the "arbitrary and capricious" standard is a narrow one, which forbids a court from substituting its judgment for that of the agency. *See id.* at 416, 91 S.Ct. 814; *see also Ethyl Corp.*, 541 F.2d at 34.

In applying the "arbitrary and capricious" standard, a court "may not supply a reasoned basis for the agency's action that the agency itself has not given," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), but a court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)). That standard directs this Court to determine "whether the decision was based on a consideration of the relevant factors and whether there was clear error of judgment." *DIRECTV, Inc. v. FCC*, 110 F.3d 816, 826 (D.C.Cir.1997) (quoting *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856). In making this determination, a Court reviews whether the agency action was arbitrary and capricious based upon the administrative record that was before the decisionmaker at the time the decision was made. *See Citizens to Preserve Overton Park*, 401 U.S. at 420, 91 S.Ct. 814.

*ural Resources Council*, 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). The Supreme Court has emphasized that "once an agency has made a decision subject to [NEPA's] procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'"[6] *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227–28, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980); *see also Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C.Cir.1991) (quoting *Strycker's Bay*, 444 U.S. at 227–28, 100 S.Ct. 497).

In this case, there is no dispute that an EIS was needed, nor that one was prepared. Rather the dispute in this case arises over the adequacy of the Final EIS (FEIS), upon which the Forest Service based its decision to use Alternative H.

### 1. *Count III—Water Delivery System*

■ Alternative H proposes to import water from the Colorado River, rather than use groundwater to supply water to the CFV development. Def. Mem. at 56 (citing FEIS at 107). Defendants anticipate that the river water will be transported "from a siding[7] near be Topock, [Arizona,] to Maine Siding, near Williams," Arizona. *Id.* (citing FEIS at 240). Defendants concede that there is no proposal yet for transporting the water from Maine Siding to the CFV development, but state that two options are "apparent:" (1) water may be transported via rail from Williams to Apex Siding (near Tusayan) and then via underground pipeline from Apex Siding to the development; or (2) water may be transported via underground pipeline from Williams to the development. *Id.* The FEIS briefly touched upon the impact of both alternatives and concluded that "further analysis under NEPA" would be necessary before either option was chosen. *Id.* at 57 (citing FEIS at 240); Pl. Mem./Opp'n. at 24.

Plaintiffs assert that the decision to segment the analysis[8] of water delivery from

6. Plaintiffs argue half-heartedly that an extra-record inquiry is appropriate in this case and cite to Ninth Circuit case precedent permitting such an inquiry. Pl. Mem./Opp'n. at 11 (citing *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir.1980)). However, Plaintiffs fail to consider the clear law in this circuit which permits an extra-record inquiry only in exceptional cases where "the agency failed 'to explain administrative action [so] as to frustrate effective judicial review'" or Plaintiffs make the "'strong showing of bad faith or improper behavior.'" *IMS, P.C. v. Alvarez*, 129 F.3d 618, 624 (D.C.Cir.1997) (quoting *Camp v. Pitts*, 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (per curiam) and *Citizens to Preserve Overton Park*, 401 U.S. at 420, 91 S.Ct. 814). Plaintiffs state generally that "the Agency failed to consider all relevant factors, including environmental impacts and viable alternatives," point to nothing specific to show that effective judicial review will be thwarted without an extra-record inquiry. Pl. Mem./Opp'n. at 11. Accordingly, the Court finds that no such inquiry is justified in this case.

7. Defendants indicate that a siding is "a short railroad track connected by switches or points at one or more places with the main track" or "a short track connecting a railroad directly with the premises of a business concern." Def. Mem. at 56.

8. In their joint Reply, Defendants address a perceived argument by the Plaintiffs that the FEIS did not address water delivery. The Court does not construe Plaintiffs' argument in this manner, and if it did, it is clear from the record that the FEIS did address the water delivery options, but in a limited manner. *See* FEIS at 240 (indicating that further NEPA analysis of the two options would be required). Rather, the Court construes Plaintiffs' argument as simply an assertion that the Forest Service "improperly segmented" the full evaluations of the water delivery options from the remainder of the Alternative H

the remainder of the Alternative H environmental impact analysis is not permitted. Plaintiffs insist that the water delivery options constitute "connected actions" that must, pursuant to 40 C.F.R. § 1508.25(a)(1) be discussed in the same impact statement. Pl. Mem./Opp'n. at 25. Section 1508.25(a)(1) provides that "connected actions" are actions that are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

40 C.F.R. § 1508.25(a)(1). The Forest Service concedes that it "purposefully chose to defer its evaluation of the water delivery options to a later phase when more detailed information ... would be available." Def. Reply at 15. Thus, the only issue before this Court regarding the water system is whether this deferral of consideration was proper under the NEPA and the relevant regulations.

Defendants first argue that the pipeline alternatives mentioned in the FEIS are not yet "proposals" which require analysis under NEPA. That is Defendants argue that a "proposal" exists only when an agency is "actively preparing to make a decision on one or more means of accomplishing" its objective, 40 C.F.R. § 1508.23, and that in this instance, the mentions of water transport in the FEIS are merely apparent alternatives, not proposals. While the law is clear that NEPA "speaks

solely in terms of proposed actions; it does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions," *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 20, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), it cannot be said that the transportation of water to the CFV development is a "less imminent" action. Contrary to Defendants' arguments, the mere fact that the agency "purposefully deferred" its decision regarding the impact of the water transportation system and determined that further information was needed, does not automatically separate the water delivery system from the remainder of the CFV project.

An examination of the three definitions of "connected actions" provided in the regulations indicates that the water delivery system comports with at least two if not all three of the alternative definitions. The Forest Service's characterization of the water delivery system in the FEIS almost concedes that the land exchange "[a]utomatically trigger[s]" the need to develop a system which will deliver water to CFV and that development of this system will require an environmental impact statement. 40 C.F.R. § 1508.25(a)(1)(*l*). The potential for a pipe line, whether connected to a railroad siding or not, is most certainly an "interdependent part [ ] of [the] larger action" that is Alternative H and "depend[s] on [that] larger action for [its] justification." *Id.* at § 1508.25(a)(1)(iii). It also seems more than likely that the construction of a pipeline to draw water from the Colorado River into the Williams area "will not proceed unless [Alternative H proceeds] previously or simultaneously." *Id.* at § 1508.25(a)(1)(ii).[9] Thus, the water trans-

---

NEPA analysis. *See* Pl. Mem./Opp'n. at 23–26,

9. Despite this clear fit into the definition of "connected action," the Forest Service insists

portation system is clearly "connected" to the remainder of the Alternative H land exchange. As a result, the Forest Service's failure to consider the water transportation proposals in its FEIS constitutes error.

In a further attempt to justify Defendants' deferral of the water analysis, CFV argues that "the proposed action is a land exchange, and not the gateway community or the water transportation system." CFV Mem. at 43. However, this self-serving characterization contradicts the true nature of the proposal, as is reflected in the FEIS. "The proposed action is the original proposal that initiated analysis under NEPA." FEIS at 21. In this instance, the original proposal, and thus, the proposed action was Alternative B. *Id.* Alternative B proposed the "private acquisition *and development* of 672 acres of NFS Land ... [which] would be used to *design*

*and build a master planned community* serving as a gateway to GCNP." *Id.* at 35 (emphasis added). Even CFV itself, in its description of the proposals which necessitated a NEPA study includes more than a mere land exchange:

> CFV prepared a *proposal to exchange* the inholdings for National Forest lands next to Tusayan *and construct* a gateway community to the National Park on the lands received in the exchange.... The Forest Service decided to evaluate under NEPA *CFV's proposal* and alternative ways of responding to the land use issues at the Grand Canyon and the National Forest.

CFV Mem. at 5–6 (emphasis added). In light of these facts, CFV's latest characterization of the proposal must be rejected.

Plaintiffs argue in addition that the FEIS failed to consider the cumulative impact of the prospective water delivery

---

that "agencies may phase their NEPA analysis." Def. Reply at 16–17 (capitalization omitted). However, even a cursory review of the tiering regulations reveals that they are inapplicable in this case:

> 'Tiering' refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.

40 C.F.R. § 1508.28. The action proposed in this case is not a national program, nor a policy statement, nor anything remotely similar to such broad action. To the contrary, the action proposed in this case is site-specific. Accordingly, to separate out the water delivery options from the remainder of the CFV plan does not fall within the provisions for tiering. *See* 40 C.F.R. § 1502.20 (Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on

an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action.). In this regard, the cases cited by Defendants are inapposite, *see, e.g., N. Plains Res. Council v. Lujan*, 874 F.2d 661 (9th Cir.1989) (analyzing agency action to determine whether actions are related, but not considering the tiering regulations); *County of Suffolk v. Sec'y of the Interior*, 562 F.2d 1368 (2d Cir.1977) (absent express consideration of tiering regulations, holding that the EIS considering offshore leasing for oil and gas exploration need not consider the effects of projected transportation modes and pipeline routes for any oil and gas that may be discovered because such projected routes would necessarily be completely speculative), or are distinguishable, *see, e.g., Nat'l Wildlife Fed'n v. FERC*, 912 F.2d 1471 (D.C.Cir.1990) (treating the proposals for which separate EICs were prepared as "phases" and declining to find that the proposals were "connected" or "cumulative" pursuant to 40 C.F.R. § 1508.25(a)(1) and (a)(2)).

system set forth in Alternative H. Pl. Mem./Opp'n. at 29. The CEQ regulations provide that and EIS should include "[c]umulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(2). The regulations define a "cumulative impact" as "the impact on the environment which results from the incremental impact of the action when added to. other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.

The thrust of Plaintiffs' motion asserts that the FEIS did not adequately consider the cumulative impacts of groundwater pumping for construction and emergencies. Pl. Mem./Opp'n. at 29. The Court cannot disagree. The only use of groundwater foreseen in conjunction with Alternative H is "in emergency situations and during initial construction." FEIS at 235. The FEIS provides that "[t]wo pumping regimens were simulated based on a projected minimum and maximum pumping rate to evaluate cumulative impacts." FEIS at 235, 236. However, there is no ensuing evaluation a chart appears in the FEIS, but there is no discussion of what it means, and thus, no assessment of the cumulative impact of groundwater pumping. *See id.* Defendants argue that such an omission is justified in light of other measures, namely (1) zoning ordinances which prohibit CFV from using groundwater during construction and (2) restrictive covenants which significantly limit groundwater use to narrowly defined situations. *See* Def. Opp. at 19–20 (explaining that the Coconino County Zoning Ordinance explicitly precludes CFV from using any groundwater during construction and explaining that a covenant which accompanies the land exchange

expressly limits the use of groundwater during emergencies).

Defendants' argument is flawed on both fronts. First, Defendants effectively concede that the FEIS analysis of the use of groundwater during construction is lacking, but argue that such insufficiency is moot in light of the zoning ordinance. If, in fact, the analysis of the use of groundwater is moot by the ordinance, then Defendants will be required to find water from some alternative source. The FEIS neither contemplates nor analyzes any such alternative. In this regard, it is incomplete. Thus, regardless of whether the Forest Service were required to analyze the cumulative impact of the use of groundwater during construction or the cumulative impact of the use of water from some other source during construction, there is no doubt that the Forest Service must conduct some analysis of use of water during construction and the environmental impacts associated with such use. Anything less fails to examine an obvious environmental impact of the proposed land exchange and development. The same is true with regard to the use of groundwater during emergencies. To say the use of this water is "limited" does not suffice as a "hard look" at the amount of groundwater which is likely to be used during emergencies, nor does it provide an analysis of the impact of the use of that water upon the environment. *See City of Grapevine,* 17 F.3d at 1503–04. Accordingly, the Court cannot say that the Forest Service has complied with NEPA absent a genuine analysis of the environmental impacts of the use of groundwater during construction and emergencies.

2. *Count IV—Failure to Consider Direct, Indirect and Cumulative Impacts*

In their cross-motion, Plaintiffs assert that Defendants did not comport with

their regulations because the FEIS does not fully analyze the "socioeconomic" impacts of Alternative H on the cities of Williams and Flagstaff, Arizona. Pl. Mem. /Opp'n. at 12. Specifically, in their memorandum, Plaintiffs assert that the Agency failed to analyze indirect economic impacts, an analysis which Plaintiffs regard as mandatory pursuant to the Forest Service Handbook (FSH) and the Forest Service Manual (FSM). *Id.* at 12–13. Defendants respond that they have conducted a thorough socioeconomic analysis and that Plaintiffs' reliance on the manuals is misplaced. In support of this position, Defendants contend that the manuals, although published in the Federal Register, are not "binding" and do not carry the same weight as regulations. Def. Reply at 7. Thus, Defendants assert that the Forest Service did consider the indirect economic impacts of all of the "Alternatives," but merely used a different methodology than that which is preferred by Plaintiffs. *See* Def. Mem. at 46.

While it is "axiomatic that an agency must adhere to its own regulations," agencies "need not adhere to mere general statements of policy." (citations and quotations omitted). *Brock v. Cathedral Bluffs Shale Oil Co.* 796 F.2d 533, 536 (D.C.Cir. 1986). *Brock* explains:

> The critical distinction between a substantive rule and a general statement of policy is the different practical effect that these two types of pronouncements have in subsequent proceedings .... A properly adopted substantive rule establishes a standard of conduct which has the force of law ....

> A general statement of policy, on the other hand, does not establish a "binding norm." It is not finally determinative of the issues or rights to which it is addressed .... A policy statement an-

nounces the agency's tentative intentions for the future ....

*Id.* at 537 (quoting *Pacific Gas & Electric Co. v. FPC,* 506 F.2d 33, 38 (D.C.Cir.1974) (internal quotations omitted)). Plaintiffs cite to *Rhodes v. Johnson,* 153 F.3d 785 (7th Cir.1998), which opines that because the manuals are published in the Federal Register and are subjected to public comment, they may have the effect of agency regulations. *Id.* at 788 (considering the status of the Forest Service's Environmental Handbook, but ultimately deferring the parties' treatment of the Handbook without determining whether the Handbook is an agency regulation). However, the law in this circuit expressly rejects publication in the Federal Register as the hallmark of a regulation. *See Brock,* 796 F.2d at 538–39. Rather, *Brock* provides that "the real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations, which the statute authorizes to contain only documents 'having general applicability *and legal effect.'*" *Id.* at 539 (quoting 44 U.S.C. § 1510) (emphasis in original). There is no assertion that the Manuals are published in the Code of Federal Regulations.

*Brock* also provides that the language used in the statement itself is significant in determining whether it is binding upon an agency. *Id.* at 537–38. The Forest Service points out that its own regulations describe the FSM and FSH as "administrative policy, procedure, and guidance." Def. Reply at 8 (citing 36 C.F.R. § 200.4(b)). This description firmly supports the view that the FSM and FSH merely provide non-mandatory guidance to the Forest Service.

In addition, the Ninth Circuit Court of Appeals addressed this same argument and unequivocally found that "the [Forest Service] Manual and Handbook are not substantive in nature," are "not promulgat-

ed in accordance with the procedural requirements of the Administrative Procedure Act," and thus, "are not regulations." *Western Radio Servs. Co. v. Espy,* 79 F.3d 896, 901 (9th Cir.1996); *see also SW Ctr. for Biological Diversity v. United States Forest Serv.,* 100 F.3d 1443, 1450 (9th Cir. 1996) ("[Plaintiff] cannot rely on the Forest Service Manual and Handbook, as this court has determined that it does not have the independent force and effect of law."); *Stone Forest Indus., Inc. v. United States,* 973 F.2d 1548, 1551 (Fed.Cir.1992) (finding that the Forest Service Manual is "a general guide for use by Forest Service employees," which "does not have the force and effect of law"). The view of the Ninth Circuit comports with the view set forth by the D.C. Circuit in *Brock.* Accordingly, the Court shall not ascribe the FSM and FSH the "weight of law."

Notwithstanding its arguments relating to the FSM and FSH, Plaintiffs have not demonstrated that the Forest Service's methodology violated agency regulations or were somehow beyond agency discretion. Because the thrust of Plaintiffs' argument boils down to a mere disagreement with the Forest Service over the methodology used to evaluate the direct effects of Alternative H, and because Plaintiffs have failed to show that the Forest Service acted irrationally, their NEPA claims in this regard cannot be sustained. *See Sierra Club v. United States Dep't of Transp.,* 753 F.2d 120, 129 (D.C.Cir.1985) ("When a court considers the sufficiency of an agency's environmental analysis, the court is not to rule on the relative merits of competing scientific opinion."); *see also, Friends of the Boundary Waters Wilderness v. Dombeck,* 164 F.3d 1115, 1130 (8th Cir.1999) ("[Courts] defer to the agency's choice of methodology as long as it is not arbitrary or without foundation."); *Oregon Envt'l Council v. Kunzman,* 817 F.2d 484, 496 (9th Cir.1987) ("NEPA does not re-

quire that we decide whether an [EIS] is based on the best scientific methodology available, nor does NEPA require us to resolve disagreements among various scientists as to methodology."); *see also, City of Grapevine, Texas,* 17 F.3d at 1507 (deferring to the "agency's expertise" in choosing a methodology for measuring sound).

Beyond Plaintiffs' indirect impact claims based on the FSH and FSM, Plaintiffs assert that the Forest Service violated NEPA by "ignor[ing] four direct economic impacts." Pl. Mem./Opp'n. at 20. Plaintiffs point to four specific measures of the impact of the various alternatives upon the cities of Williams and Flagstaff that might have been considered in the Forest Service's FEIS. In response the Forest Service asserts that this kind of criticism amounts to "impermissible flyspecking of the Forest Service's analysis and do[es] not demonstrate a NEPA violation." Def. Reply at 11.

The D.C. Circuit, like other circuits that have considered NEPA challenges, has concluded that "full, fair, bona fide compliance with NEPA," does not authorize the courts to "fly speck" the EIS, nor substitute their judgment for that of the agency. *Sierra Club v. Adams,* 578 F.2d 389, 393 (D.C.Cir.1978) (internal citations and quotations omitted). The reviewing court's role is to "to determine whether the EIS was compiled with objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors." *Id.* (internal quotations omitted). In the instant case, the Forest Service's FIES "described projected impacts of each of the alternatives under different displacement scenarios on room nights, expenditures, and retail sales tax revenue in northern Arizona communities, including Williams and Flagstaff." Def. Reply

at 11 (citing FEIS at 257–64). Moreover, the Forest Service points out that the FEIS does, in fact, address at least three of the four points of analysis upon which Plaintiffs focus. *See* Def. Mem. at 11–12 (citing to various portions of the FEIS and noting that the Forest Service analysis (1) estimated prospective declines in average retail sales volume if spending did not increase, (2) considered whether average daily hotel room rates would fall and choose to measure economic impacts through average annual occupancy rates, (3) utilized monthly/seasonal historical performance and visitation trends in the Grand Canyon/Tusayan area to develop estimates of average annual occupancy and penetration rates). Based upon these facts, it is clear that Plaintiffs are again trying to second guess the methodology used by the Forest Service to analyze the direct economic impact of the alternatives upon the surrounding area. Plaintiffs' assertion that the Forest Service's FIES failed to consider the impacts upon the Williams and Flagstaff areas is without basis. Thus, the Court concludes that Defendants' analysis of the economic impact of the various proposals did not violate NEPA.

### 3. Count V—Considering Reasonable Range of Alternatives

■ Count V of Plaintiffs' Complaint asserts that the range of alternatives considered by the Forest Service and analyzed in the FEIS was too narrow. At "the heart of the environmental impact statement," 40 C.F.R. § 1502.14 (1998), is the requirement that it identify the reasonable alternatives to the contemplated action and present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decision-maker and the public. *Id.* § 1502.14. The statute, however, directs agencies only to look hard at the environmental effects of their decisions, and not to take one type of action or another, and the courts correspondingly enforce the statute by ensuring that agencies comply with NEPA's procedures. *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C.Cir.1991). Courts have recognized that a "rule of reason" applies both to an agency's identification of the available alternatives and to its examination of their relative merits, and we have declared that we will defer to its conclusions "so long as the alternatives are reasonable and the agency discusses them in reasonable detail." *Id.* at 196. "This rule of reason governs 'both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them.'" *Id.* at 195 (emphasis in original).

In essence, Plaintiffs argue that the alternatives considered by the Forest Service improperly focus upon the need for additional retail and hotel space and that the Forest Service erred by not considering an additional "modified land exchange alternative on a much smaller scale." Pl. Mem./Opp'n. at 34, 35. Plaintiffs' foundation for this assertion derives from a misguided and convoluted attempt to characterize the "overriding" intent of the EIS as a means to "analyze appropriate ways to solve problems at the Grand Canyon identified in the 1995 General Management Plan." *Id.* However, Plaintiffs ignore their own statements to the contrary, which indicate that the "examining ways to achieve *some* of the goals listed in the 1995 General Management Plan" is but "*one* of the primary roles" of the EIS. *Id.* (emphasis added). Thus, the mere fact that the 1995 General Management Plan does not concentrate upon the need for additional retail and hotel space, by no means indicates that the Forest Service improperly included that factor in its analysis. Page one of

the FEIS clearly identifies the need for additional retail space and hotels when it states that a portion of the "goal" of the analysis "is to determine [ ] how best to provide for improvements to ... visitor services." FEIS at 1; *see also* FEIS at 5, 6 (identifying provision of land to facilitate development of community ... *and visitor* ... services and facilities in the Grand Canyon/Tusayan area as a "project objective") (emphasis added). Accordingly, Plaintiffs cannot prevail with the assertion that the Forest Service violated NEPA by declining to consider a smaller scale exchange which excluded considerations of additional hotel and retail space.

Plaintiffs also assert that the Forest Service neglected to give sufficient consideration to Alternatives D and F, which would allow a local government entity to purchase federal land at fair market value. Pl. Mem./Opp'n. at 35. Plaintiffs argue that the Forest Service's ultimate determination that Alternatives D and F were not realistic indicates that the Forest Service "never considered either alternative." *Id.* The record does not support Plaintiffs' assertion. Review of the FEIS reveals thorough examination of no less than eight alternatives. *See generally* FEIS. The fact that the Forest Service found some alternatives to be more attractive than others does not itself lend credence to Plaintiffs' conclusion that some of the alternatives were not reasonable. Quite to the contrary, the consideration of alternatives is intended to lead to exactly the sort of conclusion reached by the Forest Service in this case namely, that for one reason or another, some alternatives are more environmentally attractive than others.

Plaintiffs have raised nothing which indicates to this Court that the Forest Service's identification of Alternatives A through H is not entitled to deference. Precedent instructs this Court that partic-

ular alternatives considered by an agency as well as the depth of that consideration is subject only to review for reasonableness. *Citizens Against Burlington,* 938 F.2d at 196. In the present case, the identification and discussion of the eight alternatives which appears in the FEIS is, at a minimum, reasonable. Accordingly, because the Forest Service's "reasoned decision" is entitled to this Court's deference, Plaintiffs' challenge to the range of alternatives considered and depth of that consideration must fail. *See Tongass Conservation Soc'y v. Cheney,* 924 F.2d 1137, 1140 (D.C.Cir.1991).

### 4. *Count VII—Failure to Follow Appeal Regulations*

In their joint Opposition/Reply, Defendants concede that the Regional Forester, Eleanor Towns, violated the requirement that meetings be held fifteen day after the closing date for filing an appeal. Def. Reply at 51; 36 C.F.R. § 215.16. Rather, the meetings were held between 24 and 35 days after the closing date. Pl. Mem./Opp'n. at 72. Nonetheless, four "informal" meetings were held, and based on this fact, Defendants argue that Plaintiffs were not prejudiced by the 10 to 20 day delay. Def. Reply. at 51.

Claims that an agency had violated NEPA are reviewed "under the general review provision of the APA (5 U.S.C. § 702)." *Found. on Econ. Trends v. Lyng,* 943 F.2d 79, 82–83 (D.C.Cir.1991). Section 706 of the APA provides that agency action shall be reviewed under and "arbitrary and capricious" standard. 5 U.S.C. § 706. Section 706 also instructs courts that when reviewing agency action "due account shall be taken of the rule of prejudicial error." *Id.* This portion of the statute "sums up in succinct fashion the 'harmless error' rule applied by courts in the review of lower court decisions as well

as of administrative bodies." *Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision,* 139 F.3d 203, 212 (D.C.Cir. 1998) (quoting U.S. Dep't of Justice, Att. Gen.'s Manual on the Admin. Procedure Act 110 (1947), *reprinted in* Admin. Conference of the U.S., Fed. Admin. Procedure Sourcebook 67, 176 (2d ed.1992)). Thus, if Plaintiffs have suffered no harm by this putative procedural error, the Court may "disregard" such error. *Id.*

Defendants' assertion that Plaintiffs were not harmed by the tardiness of the informal meetings is unrebutted. *See generally* Pl. Opp. and Pl. Reply. Moreover, there is no indication from the record that Plaintiffs were prejudiced by the brief delay.[10] Accordingly, the mere fact that Defendants failed to comply with the exact timeline for holding informal meetings as required by 36 C.F.R. § 215.16 does itself not provide a basis for relief under the APA.[11]

Plaintiffs also argue that when Ms. Towns met with them or their representatives she "failed to meet with an open mind." Pl. Mem./Opp'n. at 72. Plaintiffs base this assertion on a statement in Ms. Towns' letters to then-appellants that, "I understand your concerns that something substantive come out of the meeting, but this process has been underway for almost 5 years. I think we need to realize that after our meeting, the only thing we may be able to agree on is that we disagree." *Id.* at 73 (quoting A.R. 21D, Doc. 48). In addition, Plaintiffs assert that at one meeting Ms. Towns indicated that she was not open to reconsidering her decision.

Defendants respond that Ms. Towns statement were merely a reflection of the fact that the then-appellants, in their appeal letters, indicated that the only acceptable resolution of the appeals would be a withdrawal of the Forest Service's entire decision. Def. Reply at 52 (citing A.R. 21A, Doc. 15; A.R. 21B, Doc. 18); Towns Aff. ¶ 10 ("At the beginning of the informal disposition meeting, appellants stated that nothing short of a withdrawal of the Decision would be an acceptable resolution of their issues."). In her affidavit, Ms. Towns explains that "[i]n response to this position, I stated that nothing had been provided in the appeals that would cause me to withdraw the decision at this time." Towns Aff. ¶ 10. This characterization comports with that of two appellees, which indicate in their affidavits that Ms. Towns indicated that the possibility of reversing her decision was "not up for discussion." Thurston Aff. ¶ 2; Vail Aff. ¶ 2. Ms. Towns also confirmed that she stated at the meeting that she "had not personally read all of the appeals," but indicated, however, that her "staff had provided [her] with a detailed briefing regarding the issues raised in all the appeals prior to [the] meeting." Towns Aff. ¶ 9.

The regulations governing the "informal" appeals meetings requires "the Responsible Official must contact the appellant(s) and offer to meet and discuss resolution of the issues raised in the appeal." 36 C.F.R. § 215.16(a). Plaintiffs argue that Ms. Towns statements in her letter and at the meeting indicate "disinterest in seeking common ground." Pl.

---

10. Defendants attribute the delay to the fact that thirty administrative appeals were filed in response to the Record of Decision. Defendants assert that they had "difficulty scheduling a meeting for numerous appellants, at a location convenient for the appellants." Towns Aff. ¶¶ 4,6.

11. Plaintiffs also insist that Ms. Towns did not give timely notice of the informal meetings to two individuals. Pl. Mem./Opp'n. at 72. However, Plaintiffs again fail to assert that they were prejudiced in any way by this allegedly tardy notice. As explained in the text, allegedly tardy notice alone does not justify relief under the APA.

Mem./Opp'n. at 73. The Court cannot agree. Plaintiffs' unwillingness to consider complete reversal of the agency decision, in light of the years of study put into that decision, does not strike the Court as arbitrary or capricious. The wording of the regulations seems to contemplate that there will be "issues" presented at the informal meeting for resolution, rather than a wholesale challenge to the administrative decision. Plaintiffs' position that nothing short of a reversal would be satisfactory is thus, wholly distinct from one which challenges a few or even many aspects of a decision. Ms. Towns was presented with Plaintiffs' arguments prior to the meetings, and concluded, quite reasonably that reversal of the entire decision was not justified by those arguments. This conclusion does not "deprive[ ] appellants of an opportunity to participate in good-faith negotiations." Pl. Mem./Opp'n. at 73. To the contrary, it is likely that Plaintiffs' absolutist position deprived them of the opportunity to reach common ground with Defendants. Accordingly, the Plaintiffs are not entitled to a judicial declaration that the Agency's disposition during the informal appeals process was somehow inadequate.

## IV. CONCLUSION

Based on all of the foregoing, the Court concludes that Counts I and II of Plaintiffs' Complaint must be dismissed as they are unripe for judicial review. The Court also finds that Defendants are entitled to Summary Judgment with regard to Counts IV, V, and VII of Plaintiffs' Complaint. However, the Court finds that Plaintiffs are entitled to Summary Judgment with

regard to Count III of their Complaint. Specifically, the Court finds that the Forest Service improperly segmented the water delivery system from the remainder of its NEPA analysis and the FEIS is inadequate under NEPA because it fails to consider the cumulative impacts of the use of groundwater associated with Alternative H. Accordingly, this case shall be remanded to the Forest Service to address these limited deficiencies in the FEIS, *i.e.*, the segmentation of the water delivery system and the cumulative impact of the use of groundwater associated with Alternative H. However, in light of the fact that, at this point, insurmountable obstacles inhibit the consummation of the land exchange which Plaintiffs seek to prevent, there is no need to enjoin that same exchange (Count VIII), as none is imminent.[12] An appropriate Order accompanies this Memorandum Opinion.

12. The Court notes this Memorandum Opinion issues on the same day as a separate Memorandum Opinion and Order which deny Plaintiffs' motion for leave to amend their Complaint inasmuch as the amendment seeks to add entirely new claims against additional parties. Accordingly, the resolution of the parties' motions for summary judgment fully resolves this case. Thus, the Order which accompanies this Memorandum Opinion shall constitute a final disposition for purposes of appeal.