# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 4, 2013          Decided June 11, 2013

No. 12-1298

CHLORINE INSTITUTE, INC.,
PETITIONER

v.

FEDERAL RAILROAD ADMINISTRATION, ET AL.,
RESPONDENTS

---

On Petition for Review of a Final Rule
of the Federal Railroad Administration

---

*Paul M. Donovan* argued the cause for the petitioner.

*Mark W. Pennak*, Attorney, United States Department of Justice, argued the cause for the respondents. *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Michael Jay Singer*, Attorney, *Paul M. Geier*, Assistant General Counsel, United States Department of Transportation, *Peter J. Plocki*, Deputy Assistant General Counsel, and *Christopher Perry* and *Rebecca S. Behravesh*, Trial Attorneys, Federal Railroad Administration, were on brief.

*Thomas H. Dupree Jr.*, *Michael R. Huston*, *Louis P. Warchot* and *Michael J. Rush* were on brief for *amicus curiae* Association of American Railroads in support of the respondents.

Before: HENDERSON, BROWN and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

Concurring Opinion filed by *Circuit Judge* KAVANAUGH.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The Chlorine Institute, Inc. (Institute)[1] challenges the final rule promulgated by the Federal Railroad Administration (FRA) to implement section 104 of the Rail Safety Improvement Act of 2008 (Act), which requires that a qualifying rail carrier submit an implementation plan to install a "positive train control" (PTC) system[2] no later than December 31, 2015 on certain tracks used for passenger service or for transporting "poison- or toxic- by-inhalation" hazardous material (PIH or TIH), such as chlorine, Pub. L. No. 110-432 § 104(a)(1), 122 Stat. 4848, 4857 (Oct. 16, 2008) (49 U.S.C. §20157(a)(1)). Positive Train Control Systems (RRR), 77 Fed. Reg. 28,285 (May 14, 2012) (2012 Final Rule). The 2012 Final Rule establishes 2008 as the baseline year for determining whether tracks carry passengers or PIH so as to require PTC—subject to an exclusion/removal exception for segments that will no longer carry such traffic as of the December 31, 2015 implementation deadline. The Institute challenges as arbitrary and capricious and contrary to congressional intent FRA's decision to omit from the 2012 Final Rule a two-part risk assessment test a carrier had been required

---

[1]The Institute is a trade association representing producers, packagers, distributors, users and suppliers of chlorine and related products.

[2]A PTC system is "a system designed to prevent train-to-train collisions, over-speed derailments, incursions into established work zone limits, and the movement of a train through a switch left in the wrong position." 49 U.S.C. § 20157(i)(3); *see* 49 C.F.R. subt. B, ch. II, pt. 236, Subpt. I.

to meet to qualify for exclusion/removal under two previous PTC rules. Because the Institute has not established that its members now face a present or imminent injury from the 2012 Final Rule's omission, we conclude its challenge is not ripe.

**I.**

In 2008, the Congress enacted the Act with the intent, inter alia, "to prevent railroad fatalities, injuries, and hazardous materials releases." Pub. L. No. 110-432, 122 Stat. at 4848. Section 104 of the Act governs the "[i]mplementation of positive train control systems" and requires that no later than 18 months after its enactment date of October 16, 2008, each Class I railroad carrier[3] and any entity providing regularly scheduled intercity or commuter rail passenger transportation develop and submit to the Department of Transportation

> a plan for implementing a positive train control system by December 31, 2015, governing operations on—
>
>> (A) its main line over which intercity rail passenger transportation or commuter rail passenger transportation, as defined in section 24102, is regularly provided;
>>
>> (B) its main line over which poison- or toxic-by-inhalation hazardous materials, as defined in [49 C.F.R. §§] 171.8, 173.115, and 173.132 . . . , are transported; and
>>
>> (C) such other tracks as the Secretary [of Transportation] may prescribe by regulation or order.

---

[3]A Class I carrier is one having annual operating revenues of $250 million or more. *Commuter Rail Div. of Reg'l Transp. Auth. v. Surface Transp. Bd.*, 608 F.3d 24, 28 n.2 (D.C. Cir. 2010) (citing 49 C.F.R. § 1201.1-1).

49 U.S.C. § 20157(a)(1).[4] Section 104 further (1) authorizes the Secretary to "provide technical assistance and guidance to railroad carriers in developing the [required PTC] plans," (2) requires the Secretary to conduct an annual review to ensure the carriers' compliance therewith and to report to the Congress no later than December 31, 2012 on the carriers' progress and (3) authorizes the Secretary to assess civil penalties for violating any of section 20157's provisions. *Id*. § 20157(b)-(e). In addition, section 104(g) vests the Secretary with broad implementation authority:

> The Secretary shall prescribe regulations or issue orders necessary to implement this section, including regulations specifying in appropriate technical detail the essential functionalities of positive train control systems, and the means by which those systems will be qualified.

*Id*. § 20157(g).[5] Accordingly, in July 2009, FRA issued a notice of proposed rulemaking to implement the mandate. Positive Train Control Systems, 74 Fed. Reg. 35,950 (July 21, 2009).

FRA has since promulgated three successive final rules governing PTC. The first rule, issued in January 2010, established calendar year 2008 as the baseline year for determining whether a main line carries either passenger or PIH traffic so as to require PTC. Positive Train Control Systems, 75 Fed. Reg. 2598, 2700 (Jan. 15, 2010) (January 2010 Final Rule) (49 C.F.R. § 236.1005(b)(2) (2010)). Recognizing, however,

---

[4]"The term 'main line' means a segment or route of railroad tracks over which 5,000,000 or more gross tons of railroad traffic is transported annually . . . ." 49 U.S.C. § 20157(i)(2).

[5]The Secretary delegated to the FRA his authority to implement the Act. 49 C.F.R. § 1.49(oo) (2009), recodified at *id*. § 1.89(b) (2012).

that routing could change between the 2008 baseline and the Act's December 31, 2015 PTC implementation deadline, the January 2010 Final Rule permitted a railroad to request the "[e]xclusion or removal of track segments from [the] PTC baseline . . . based upon changes in rail traffic such as reductions in total traffic volume or cessation of passenger or PIH service." *Id*. at 2701 (49 C.F.R. § 236.1005(b)(4)(I) (2010)). "In the case of cessation of PIH traffic over a track segment," the request was to be approved "upon a showing by the railroad that . . . [t]here is no remaining local PIH traffic expected on the track segment" and that the PTC exclusion/removal satisfied a two-part test, which included: (1) an "alternative route" analysis requiring that alternative route(s) to the excluded tracks be "shown to be substantially as safe and secure" as the excluded tracks; and (2) a "residual risk" analysis, requiring that, after cessation of PIH traffic, "the remaining risk associated with PTC-preventable accidents" not exceed the average comparable risks of other tracks required to be PTC-equipped. *Id*. at 2701-02 (49 C.F.R. § 236.1005(b)(4)(I) (2010), *superseded by* 49 C.F.R. § 236.1020 (effective Nov. 26, 2010)).[6]

Finally, the January 2010 Final Rule warned:

This is a final rule; however, FRA has identified specific provisions for which we are considering making changes to the final rule, if warranted by the public comments received. We expect to publish our response to those comments, including any possible

---

[6]The two-part test was new in the January 2010 Final Rule. The proposed rule had simply "said that changes from the 2008 base could be granted if 'consistent with safety.' " January 2010 Final Rule, 75 Fed Reg. at 2619. FRA explained that the two-part test "fleshes out the 'consistent with safety' notion contained in the proposed rule with the desired objective of providing greater predictability, transparency, and consistency in decision making." *Id*. at 2620.

changes to the rule made as a result of them, as soon as possible following the end of the comment period. However, the limited areas of this rule open for additional comment do not affect the requirement for railroads to prepare and submit plans in accordance with the deadlines established in this final rule.

*Id*. at 2598. In particular, it advised:

FRA will continue to seek comments limited to increasing the clarity, certainty, and transparency of the criteria governing the removal from a PTC[ Implementation Plan] (and therefore from the requirement to install PTC) of any track segments on which PTC systems have yet to be installed for which a railroad seeks relief from the requirement to install PTC. . . . Any further comments should be limited to the scope of the issues indicated in this preamble to which FRA seeks further comments.

*Id*. at 2605.

After further comments and a hearing, FRA promulgated its second final rule in September 2010. Positive Train Control Systems, 75 Fed. Reg. 59,108 (Sept. 27, 2010). (September 2010 Final Rule). The September 2010 Final Rule left the exclusion/removal provision largely unchanged but moved it to a separate, newly promulgated regulation, 49 C.F.R. § 236.1020 ("Exclusion of track segments for implementation due to cessation of PIH materials service or rerouting." (2010-11)). 75 Fed. Reg. at 59,117. Under the reworded (but substantively unchanged) regulation, each carrier was required to show that there was "no remaining local PIH materials traffic expected on the track segment" and that the rerouting passed both the "alternative route" and the "residual risk" prongs of the qualifying test. *Id*. at 59,117 (49 C.F.R. § 236.1020(b)(1)(-3) (2010)).

The Association of American Railroads (AAR) petitioned this court to review both the January 2010 Final Rule and the September 2010 Final Rule, challenging, inter alia, the "backward-looking" 2008 baseline. *See* Pet'r Br., *Ass'n of Am. R.Rs. v. Fed. R.R. Admin.*, Nos. 10-1198 & 10-1308, at 36 (D.C. Cir. Nov. 10, 2010). On March 2, 2011, AAR and FRA reached a settlement, agreeing to move to hold the case in abeyance pending a new rulemaking proceeding. On March 3, 2011, we granted their motion. *Ass'n of Am. R.Rs. v. Fed. R.R. Admin.*, Nos. 10-1198 & 10-1308 (D.C. Cir. filed Mar. 3, 2011) (per curiam order).

Pursuant to the settlement, in August 2011, FRA filed a new Notice of Proposed Rulemaking to consider eliminating the two-part test for exclusion/removal from the 2008 baseline. Positive Train Control Systems, 76 Fed. Reg. 52,918, 52,921 (Aug. 24, 2011). In May 2012, FRA published the 2012 Final Rule, which did precisely that, stating in the preamble: "Having considered the public comments on the [Notice of Proposed Rulemaking], FRA is promulgating this final rule eliminating the two qualifying tests." 77 Fed. Reg. at 28,286. FRA explained that retaining the two-part test "could potentially require PTC system implementation at a great cost to the railroads on lines that will not carry PIH materials traffic as of December 31, 2015." *Id*. at 28,298. Accordingly, under the 2012 Final Rule, an exclusion/removal request is approved upon a showing that, as of December 31, 2015, there will be no passenger service or PIH traffic on the tracks. *Id*. at 28,305 (codified at 49 C.F.R. § 236.1005(b)(4)(ii) (2012)). The Institute timely petitioned for review.

## II.

Ordinarily, we would review FRA's interpretation of the Act under *Chevron USA Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), and FRA's application of the statute pursuant to the Administrative Procedure Act, 5 U.S.C.

§§ 701 et seq. *See Ass'n of Am. R.Rs. v. Dep't of Transp.*, 38 F.3d 582 (D.C. Cir. 1994). Here, however, we lack jurisdiction to consider the Institute's arguments on the merits because its challenge is not ripe. *See Exxon Mobil Corp. v. FERC*, 501 F.3d 204, 207 (D.C. Cir. 2007) ("Before we reach the merits . . . , we consider whether the issue is ripe for judicial review. . . . The question of ripeness goes to our subject matter jurisdiction, and thus we can raise the issue sua sponte at any time." (quotation marks omitted)).

The ripeness doctrine is "designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–149 (1967)). "Part of the doctrine is subsumed into the Article III requirement of standing, which requires a petitioner to allege *inter alia* an injury-in-fact that is 'imminent' or 'certainly impending.' " *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012); *see Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 138 (1974) ("[I]ssues of ripeness involve, at least in part, the existence of a live 'Case or Controversy' . . . ."); *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999) ("Just as the constitutional standing requirement for Article III jurisdiction bars disputes not involving injury-in-fact, the ripeness requirement excludes cases not involving present injury."); *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) ("Ripeness, while often spoken of as a justiciability doctrine distinct from standing, in fact shares the constitutional requirement of

standing that an injury in fact be certainly impending.").[7] The Institute has failed this part of the ripeness test because it has not demonstrated that it faces an imminent or certainly impending injury.

To establish such an injury, the Institute must show that "at least one of its members 'is under threat of suffering "injury in fact" that is concrete and particularized [and] the threat must be actual and imminent, not conjectural or hypothetical.' " *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The Institute claims its members are "directly injured by FRA's policy decision to no longer rely upon traffic movements during 2008 as the basis for PTC Implementation Plans [] and by the elimination of the two-part test and the resulting ability of the railroads to restrict or eliminate chlorine transportation by rail," because PIH traffic will no longer be able to travel over those tracks that a carrier does not equip with PTC. Pet'r Br. 6; *see also id*. at 7-8 (citing "the injury imposed by FRA in eliminating 2008 as the base year for determining track segments requiring PTC, and eliminating the two-part test allowing the nation's major railroads to reduce the trackage over which they carry chlorine and other TIH materials"); *id*. at 9 ("The causal relationship between the elimination of the 2008 base year and the two-part test was to injure chlorine and other TIH shippers by limiting or eliminating their ability to ship their products by rail."). According to the Institute, the "most immediate impact on TIH shippers, including chlorine shippers, *would be* to severely limit or eliminate their ability to ship product by rail, and thus to remain in the chlorine manufacturing

---

[7]"Even if a case is 'constitutionally ripe,' though, there may also be 'prudential reasons for refusing to exercise jurisdiction.' " *Am. Petroleum Inst. v. EPA*, 683 F.3d at 386.

and consuming business" *Id*. at 9 (emphasis added). But the described impact is—at most—speculative. At this stage, we do not know which track segments will be fitted with PTC under the plans that are submitted by carriers and ultimately approved by FRA—much less whether any Institute member's ability to ship PIH will be significantly affected because more tracks will not require PTC under the 2012 Final Rule than would have under the January 2010 and September 2010 Final Rules. *Cf*. *Id*. ("No one can predict the result of each and every application of the two-part test to any track segment . . . ."). Nor has the Institute asserted any carrier has diminished—or is about to diminish—any individual member's shipping ability—only that a carrier *could* do so. *See, e.g.*, *Id*. at 8 ("[W]ith the passage of the [Act] the railroads were inadvertently *given the perfect opportunity* to restrict or eliminate chlorine shipments by rail." (emphasis added)); Reply Br. 13-14 ("[T]he railroads *will be permitted* to avoid PTC installation on thousands of miles of rail tracks. The absence of PTC on those tracks will prohibit the Institute's members from shipping chlorine over those tracks and eliminate the ability for those members to market their chlorine in the normal course of business." (emphasis added)). FRA acknowledges that eliminating the two-part test will result in a "smaller map of PTC-equipped line segments," causing more rerouting of PIH traffic than under the 2010 rules. *See* 2012 Final Rule, 77 Fed. Reg. at 28,291. But rerouting—which is a necessary consequence of the Congress's decision to restrict PIH traffic to PTC-equipped tracks—does not necessarily "severely limit" or "eliminate" a chlorine shipper's ability to ship its product by rail—it simply requires a different shipping route be used. At this point, we do not know how routing may change—or whether the additional rerouting under the 2012 Final Rule will affect—an Institute member's ability to transport

chlorine.[8]  As the PTC Implementation Plan process advances and its impact becomes clearer, such an injury may indeed emerge and the Institute's challenge may thereby ripen.[9]  It is not ripe now.

For the foregoing reasons, we dismiss the Institute's petition for lack of jurisdiction.

*So ordered.*

---

[8]The picture is further blurred by the prospect that three separate federal agencies may be involved in shaping it: (1) FRA, which regulates PTC; (2) the Pipeline and Hazardous Materials Safety Administration, which  carries out "duties and powers related to pipeline and hazardous materials transportation and safety," 49 U.S.C. § 108(f), including overseeing rail carrier routing, 49 C.F.R. § 172.820; and (3) the Surface Transportation Board (STB), which generally regulates rail carrier transportation, service and rates, *see* 49 U.S.C. § 11101.  FRA insists that the STB's exercise of its own authority to enforce a railroad carrier's statutory obligation to "provide [] transportation or service on reasonable request," *id*. § 11101(a), will ensure the availability of rail carriage to PIH shippers.  *See* Oral Argument Recording at 37:50 (Apr. 4, 2013) ("Positive Train Control takes a backseat to the common carriage requirement.").  We need not unravel the tangled regulatory interaction but only note that it adds to the unpredictability regarding future PIH transportation availability.

[9]Under the 2012 Final Rule, third parties such as the Institute "have an opportunity to express their views on the plans submitted pursuant to the PTC rule."  77 Fed. Reg. at 28,290.  Under 49 C.F.R. § 236.1011(e):

> Upon receipt of a [PTC plan], FRA posts on its public web site notice of receipt and reference to the public docket in which a copy of the filing has been placed. FRA may consider any public comment on each document to the extent practicable within the time allowed by law and without delaying implementation of PTC systems.

KAVANAUGH, *Circuit Judge*, concurring: I join the Court's opinion but add a point significant to my resolution of the case. As was discussed at oral argument, the Surface Transportation Board will ensure that chlorine shippers continue to receive common-carrier transportation on railroads when such transportation is reasonably requested. *See* 49 U.S.C. § 11101(a) ("A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part shall provide the transportation or service on reasonable request."). When the Board requires a railroad to provide common-carrier service to chlorine shippers, the railroad will have to allow the shipment and, if necessary under the Rail Safety Improvement Act of 2008, will have to equip the relevant track with positive train control. With that understanding, I join the judgment and opinion of the Court holding that the Chlorine Institute does not at this time face an actual or imminent injury from the 2012 Final Rule.